# HURD ET UX. *v.* HODGE ET AL.

NO. 290.

Argued January 15–16, 1948.—Decided May 3, 1948.

*Charles H. Houston* and *Phineas Indritz* argued the cause for petitioners. With them on the brief was *Spottswood W. Robinson, III.*

By special leave of Court, *Solicitor General Perlman* argued the cause for the United States, as *amicus curiae,* supporting petitioners. With him on the brief was *Attorney General Clark.*

*Henry Gilligan* and *James A. Crooks* argued the cause and filed a brief for respondents.

Briefs of *amici curiae* supporting petitioners were filed by *A. L. Wirin, Saburo Kido* and *Fred Okrand* for the Japanese American Citizens League; *Robert W. Kenny, O. John Rogge* and *Mozart G. Ratner* for the National Lawyers Guild; *Lee Pressman, Eugene Cotton, Frank Donner, John J. Abt, Leon M. Despres, M. H. Goldstein, Isadore Katz, David Rein, Samuel L. Rothbard, Harry Sacher, William Standard* and *Lindsay P. Walden* for the Congress of Industrial Organizations et al.; *Phineas Indritz, Irving R. M. Panzer* and *Richard A. Solomon* for the American Veterans Committee; *William Maslow, Shad Polier, Joseph B. Robison, Byron S. Miller* and *William Strong* for the American Jewish Congress; *Joseph M. Proskauer* and *Jacob Grumet* for the American Jewish Committee et al.; *William Strong* for the American Indian Citizens League of California, Inc.; *Francis M. Dent, Walter M. Nelson, Eugene H. Buder, Victor B. Harris, Luther Ely Smith* and *Harold I. Kahen* for the American Civil Liberties Union; *Herbert S. Thatcher* and

*Robert A. Wilson* for the American Federation of Labor; *Earl B. Dickerson, Richard E. Westbrooks* and *Loring B. Moore* for the National Bar Association; *Alger Hiss, Joseph M. Proskauer* and *Victor Elting* for the American Association for the United Nations; and *Edward C. Park* and *Frank B. Frederick* for the American Unitarian Association.

Briefs of *amici curiae* supporting respondents were filed by *E. Hilton Jackson* and *John W. Jackson* for the Federation of Citizens Associations of the District of Columbia et al.; and *Thomas F. Cadwalader* and *Carlyle Barton* for the Mount Royal Protective Association, Inc.

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

These are companion cases to *Shelley* v. *Kraemer* and *McGhee* v. *Sipes, ante,* p. 1, and come to this Court on certiorari to the United States Court of Appeals for the District of Columbia.

In 1906, twenty of thirty-one lots in the 100 block of Bryant Street, Northwest, in the City of Washington, were sold subject to the following covenant:

". . . that said lot shall never be rented, leased, sold, transferred or conveyed unto any Negro or colored person, under a penalty of Two Thousand Dollars ($2,000), which shall be a lien against said property."

The covenant imposes no time limitation on the restriction.

Prior to the sales which gave rise to these cases, the twenty lots which are subject to the covenants were at all times owned and occupied by white persons, except for a brief period when three of the houses were occupied by Negroes who were eventually induced to move without

legal action. The remaining eleven lots in the same block,[1] however, are not subject to a restrictive agreement and, as found by the District Court, were occupied by Negroes for the twenty years prior to the institution of this litigation.

These cases involve seven of the twenty lots which are subject to the terms of the restrictive covenants. In No. 290, petitioners Hurd, found by the trial court to be Negroes,[2] purchased one of the restricted properties from the white owners. In No. 291, petitioner Urciolo, a white real estate dealer, sold and conveyed three of the restricted properties to the Negro petitioners Rowe, Savage, and Stewart. Petitioner Urciolo also owns three other lots in the block subject to the covenants. In both cases, the Negro petitioners are presently occupying as homes the respective properties which have been conveyed to them.

Suits were instituted in the District Court by respondents, who own other property in the block subject to the terms of the covenants, praying for injunctive relief to enforce the terms of the restrictive agreement. The cases were consolidated for trial, and after a hearing, the court entered a judgment declaring null and void the deeds of the Negro petitioners; enjoining petitioner Urciolo and one Ryan, the white property owners who had sold the houses to the Negro petitioners, from leasing, selling or conveying the properties to any Negro or colored person; enjoining the Negro petitioners from leasing or conveying the properties and directing those petitioners "to remove themselves and all of their personal belongings" from the premises within sixty days.

---

[1] All of the residential property in the block is on the south side of the street, the northern side of the street providing a boundary for a public park.

[2] Petitioner James M. Hurd maintained that he is not a Negro but a Mohawk Indian.

The United States Court of Appeals for the District of Columbia, with one justice dissenting, affirmed the judgment of the District Court.[3] The majority of the court was of the opinion that the action of the District Court was consistent with earlier decisions of the Court of Appeals and that those decisions should be held determinative in these cases.

Petitioners have attacked the judicial enforcement of the restrictive covenants in these cases on a wide variety of grounds. Primary reliance, however, is placed on the contention that such governmental action on the part of the courts of the District of Columbia is forbidden by the due process clause of the Fifth Amendment of the Federal Constitution.[4]

Whether judicial enforcement of racial restrictive agreements by the federal courts of the District of Columbia violates the Fifth Amendment has never been adjudicated by this Court. In *Corrigan* v. *Buckley,* 271 U. S. 323 (1926), an appeal was taken to this Court from a judgment of the United States Court of Appeals for the District of Columbia which had affirmed an order of the lower court granting enforcement to a restrictive covenant. But as was pointed out in our opinion in *Shelley* v. *Kraemer, supra,* the only constitutional issue which had been raised in the lower courts in the *Corrigan* case, and, consequently, the only constitutional question before this Court on appeal, related to the validity of the private agreements as such. Nothing in the opinion

---

[3] 82 U. S. App. D. C. 180, 162 F. 2d 233 (1947).

[4] Other contentions made by petitioners include the following: judicial enforcement of the covenants is contrary to § 1978 of the Revised Statutes, derived from the Civil Rights Act of 1866, and to treaty obligations of the United States contained in the United Nations' charter; enforcement of the covenants is contrary to the public policy; enforcement of the covenants is inequitable.

of this Court in that case, therefore, may properly be regarded as an adjudication of the issue presented by petitioners in this case which concerns, not the validity of the restrictive agreements standing alone, but the validity of court enforcement of the restrictive covenants under the due process clause of the Fifth Amendment.[5] See *Shelley* v. *Kraemer, supra* at p. 8.

This Court has declared invalid municipal ordinances restricting occupancy in designated areas to persons of specified race and color as denying rights of white sellers and Negro purchasers of property, guaranteed by the due process clause of the Fourteenth Amendment. *Buchanan* v. *Warley,* 245 U. S. 60 (1917); *Harmon* v. *Tyler,* 273 U. S. 668 (1927); *Richmond* v. *Deans,* 281 U. S. 704 (1930). Petitioners urge that judicial enforcement of the restrictive covenants by courts of the District of Columbia should likewise be held to deny rights of

---

[5] Prior to the present litigation, the United States Court of Appeals for the District of Columbia had considered cases involving enforcement of racial restrictive agreements on at least eight occasions. *Corrigan* v. *Buckley,* 55 App. D. C. 30, 299 F. 899 (1924); *Torrey* v. *Wolfes,* 56 App. D. C. 4, 6 F. 2d 702 (1925); *Russell* v. *Wallace,* 58 App. D. C. 357, 30 F. 2d 981 (1929); ·*Cornish* v. *O'Donoghue,* 58 App. D. C. 359, 30 F. 2d 983 (1929); *Grady* v. *Garland,* 67 App. D. C. 73, 89 F. 2d 817 (1937); *Hundley* v. *Gorewitz,* 77 U. S. App. D. C. 48, 132 F. 2d 23 (1942); *Mays* v. *Burgess,* 79 U. S. App. D. C. 343, 147 F. 2d 869 (1945); *Mays* v. *Burgess,* 80 U. S. App. D. C. 236, 152 F. 2d 123 (1945).

In *Corrigan* v. *Buckley, supra,* the first of the cases decided by the United States Court of Appeals and relied on in most of the subsequent decisions, the opinion of the court contains no consideration of the specific issues presented to this Court in these cases. An appeal from the decision in *Corrigan* v. *Buckley* was dismissed by this Court. 271 U. S. 323 (1926). See discussion *supra.* In *Hundley* v. *Gorewitz, supra,* the United States Court of Appeals refused enforcement of a restrictive agreement where changes in the character of the neighborhood would have rendered enforcement inequitable.

white sellers and Negro purchasers of property, guaranteed by the due process clause of the Fifth Amendment. Petitioners point out that this Court in *Hirabayashi* v. *United States,* 320 U. S. 81, 100 (1943), reached its decision in a case in which issues under the Fifth Amendment were presented, on the assumption that "racial discriminations are in most circumstances irrelevant and therefore prohibited . . . ." And see *Korematsu* v. *United States,* 323 U. S. 214, 216 (1944).

Upon full consideration, however, we have found it unnecessary to resolve the constitutional issue which petitioners advance; for we have concluded that judicial enforcement of restrictive covenants by the courts of the District of Columbia is improper for other reasons hereinafter stated.[6]

Section 1978 of the Revised Statutes, derived from § 1 of the Civil Rights Act of 1866,[7] provides:

> "All citizens of the United States shall have the same right, in every State and Territory, as is en-

---

[6] It is a well-established principle that this Court will not decide constitutional questions where other grounds are available and dispositive of the issues of the case. Recent expressions of that policy are to be found in *Alma Motor Co.* v. *Timken-Detroit Axle Co.,* 329 U. S. 129 (1946); *Rescue Army* v. *Municipal Court,* 331 U. S. 549 (1947).

[7] 14 Stat. 27. Section 1 of the Act provided: ". . . That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment,

joyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." [8]

All the petitioners in these cases, as found by the District Court, are citizens of the United States. We have no doubt that, for the purposes of this section, the District of Columbia is included within the phrase "every State and Territory." [9] Nor can there be doubt of the constitutional power of Congress to enact such legislation with reference to the District of Columbia. [10]

We may start with the proposition that the statute does not invalidate private restrictive agreements so long as the purposes of those agreements are achieved by the parties through voluntary adherence to the terms. The action toward which the provisions of the statute under consideration is directed is governmental action. Such was the holding of *Corrigan* v. *Buckley, supra.*

In considering whether judicial enforcement of restrictive covenants is the kind of governmental action which

___

pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding."

The Civil Rights Act of 1866 was reenacted in § 18 of the Act of May 31, 1870, 16 Stat. 144, passed subsequent to the adoption of the Fourteenth Amendment. Section 1977 of the Revised Statutes (8 U. S. C. § 41), derived from § 16 of the Act of 1870, which in turn was patterned after § 1 of the Civil Rights Act of 1866, provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

[8] 8 U. S. C. § 42.

[9] Cf. *Talbott* v. *Silver Bow County,* 139 U. S. 438, 444 (1891).

[10] See *Keller* v. *Potomac Electric Power Co.,* 261 U. S. 428, 442–443 (1923).

the first section of the Civil Rights Act of 1866 was intended to prohibit, reference must be made to the scope and purposes of the Fourteenth Amendment; for that statute and the Amendment were closely related both in inception and in the objectives which Congress sought to achieve.

Both the Civil Rights Act of 1866 and the joint resolution which was later adopted as the Fourteenth Amendment were passed in the first session of the Thirty-Ninth Congress.[11] Frequent references to the Civil Rights Act are to be found in the record of the legislative debates on the adoption of the Amendment.[12] It is clear that in many significant respects the statute and the Amendment were expressions of the same general congressional policy. Indeed, as the legislative debates reveal, one of the primary purposes of many members of Congress in supporting the adoption of the Fourteenth Amendment was to incorporate the guaranties of the Civil Rights Act of 1866 in the organic law of the land.[13] Others supported the adoption of the Amendment in order to eliminate

---

[11] The Civil Rights Act of 1866 became law on April 9, 1866. The Joint Resolution submitting the Fourteenth Amendment to the States passed the House of Representatives on June 13, 1866, having previously passed the Senate on June 8. Cong. Globe, 39th Cong., 1st Sess. 3148–3149, 3042.

[12] See, e. g., Cong. Globe, 39th Cong., 1st Sess. 2459, 2461, 2462, 2465, 2467, 2498, 2506, 2511, 2538, 2896, 2961, 3035.

[13] Thus, Mr. Thayer of Pennsylvania, speaking in the House of Representatives, stated: "As I understand it, it is but incorporating in the Constitution of the United States the principle of the civil rights bill which has lately become a law, . . . in order . . . that that provision so necessary for the equal administration of the law, so just in its operation, so necessary for the protection of the fundamental rights of citizenship, shall be forever incorporated in the Constitution of the United States." Cong. Globe, 39th Cong., 1st Sess. 2465. And note the remarks of Mr. Stevens of Pennsylvania

doubt as to the constitutional validity of the Civil Rights Act as applied to the States.[14]

The close relationship between § 1 of the Civil Rights Act and the Fourteenth Amendment was given specific recognition by this Court in *Buchanan* v. *Warley, supra* at 79. There, the Court observed that, not only through the operation of the Fourteenth Amendment, but also by virtue of the "statutes enacted in furtherance of its purpose," including the provisions here considered, a colored man is granted the right to acquire property free from interference by discriminatory state legislation. In *Shelley* v. *Kraemer, supra,* we have held that the Fourteenth Amendment also forbids such discrimination where imposed by state courts in the enforcement of restrictive covenants. That holding is clearly indicative of the construction to be given to the relevant provisions of the Civil Rights Act in their application to the Courts of the District of Columbia.

Moreover, the explicit language employed by Congress to effectuate its purposes leaves no doubt that judicial

---

in reporting to the House the joint resolution which was subsequently adopted as the Fourteenth Amendment. *Id.* at 2459. See also *id.* at 2462, 2896, 2961. That such was understood to be a primary purpose of the Amendment is made clear not only from statements of the proponents of the Amendment but of its opponents. *Id.* at 2467, 2538. See Flack, The Adoption of the Fourteenth Amendment 94–96.

[14] No doubts were expressed as to the constitutionality of the Civil Rights Act in its application to the District of Columbia. Senator Poland of Vermont stated: "It certainly seems desirable that no doubt should be left existing as to the power of Congress to enforce principles lying at the very foundation of all republican government if they be denied or violated by the States, and I cannot doubt but that every Senator will rejoice in aiding to remove all doubt upon this power of Congress." Cong. Globe, 39th Cong., 1st Sess. 2961. See also *id.* at 2461, 2498, 2506, 2511, 2896, 3035.

enforcement of the restrictive covenants by the courts of the District of Columbia is prohibited by the Civil Rights Act. That statute, by its terms, requires that all citizens of the United States shall have the same right "as is enjoyed by white citizens . . . to inherit, purchase, lease, sell, hold, and convey real and personal property." That the Negro petitioners have been denied that right by virtue of the action of the federal courts of the District is clear. The Negro petitioners entered into contracts of sale with willing sellers for the purchase of properties upon which they desired to establish homes. Solely because of their race and color they are confronted with orders of court divesting their titles in the properties and ordering that the premises be vacated. White sellers, one of whom is a petitioner here, have been enjoined from selling the properties to any Negro or colored person. Under such circumstances, to suggest that the Negro petitioners have been accorded the same rights as white citizens to purchase, hold, and convey real property is to reject the plain meaning of language. We hold that the action of the District Court directed against the Negro purchasers and the white sellers denies rights intended by Congress to be protected by the Civil Rights Act and that, consequently, the action cannot stand.

But even in the absence of the statute, there are other considerations which would indicate that enforcement of restrictive covenants in these cases is judicial action contrary to the public policy of the United States,[15] and as such should be corrected by this Court in the exercise of its supervisory powers over the courts of the District of Columbia.[16] The power of the federal courts to en-

---

[15] See *United States* v. *Hutcheson,* 312 U. S. 219, 235 (1941); *Johnson* v. *United States,* 163 F. 30, 32 (1908).

[16] Section 240 (a) of the Judicial Code, 43 Stat. 938, 28 U. S. C. § 347 (a), provides: "In any case, civil or criminal, in a circuit court

force the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States as manifested in the Constitution, treaties, federal statutes, and applicable legal precedents.[17] Where the enforcement of private agreements would be violative of that policy, it is the obligation of courts to refrain from such exertions of judicial power.[18]

We are here concerned with action of federal courts of such a nature that if taken by the courts of a State would violate the prohibitory provisions of the Fourteenth Amendment. *Shelley* v. *Kraemer, supra.* It is not consistent with the public policy of the United States to permit federal courts in the Nation's capital to exercise general equitable powers to compel action denied the state courts where such state action has been held to be violative of the guaranty of the equal protection of the laws.[19] We cannot presume that the public policy of the United States manifests a lesser concern for the protection

---

of appeals, or in the Court of Appeals of the District of Columbia, it shall be competent for the Supreme Court of the United States, upon the petition of any party thereto, whether Government or other litigant, to require by certiorari, either before or after a judgment or decree by such lower court, that the cause be certified to the Supreme Court for determination by it with the same power and authority, and with like effect, as if the cause had been brought there by unrestricted writ of error or appeal."

[17] *Muschany* v. *United States,* 324 U. S. 49, 66 (1945). And see *License Tax Cases,* 5 Wall. 462, 469 (1867).

[18] Cf. *Kennett* v. *Chambers,* 14 How. 38 (1852); *Tool Co.* v. *Norris,* 2 Wall. 45 (1865); *Sprott* v. *United States,* 20 Wall. 459 (1874); *Trist* v. *Child,* 21 Wall. 441 (1875); *Oscanyan* v. *Arms Co.,* 103 U. S. 261 (1881); *Burt* v. *Union Central Life Insurance Co.,* 187 U. S. 362 (1902); *Sage* v. *Hampe,* 235 U. S. 99 (1914). And see *Beasley* v. *Texas & Pacific R. Co.,* 191 U. S. 492 (1903).

[19] Cf. *Gandolfo* v. *Hartman,* 49 F. 181, 183 (1892).

of such basic rights against discriminatory action of federal courts than against such action taken by the courts of the States.

*Reversed.*

Mr. Justice Reed, Mr. Justice Jackson, and Mr. Justice Rutledge took no part in the consideration or decision of these cases.

Mr. Justice Frankfurter, concurring.

In these cases, the plaintiffs ask equity to enjoin white property owners who are desirous of selling their houses to Negro buyers simply because the houses were subject to an original agreement not to have them pass into Negro ownership. Equity is rooted in conscience. An injunction is, as it always has been, "an extraordinary remedial process which is granted, not as a matter of right but in the exercise of a sound judicial discretion." *Morrison* v. *Work,* 266 U. S. 481, 490. In good conscience, it cannot be "the exercise of a sound judicial discretion" by a federal court to grant the relief here asked for when the authorization of such an injunction by the States of the Union violates the Constitution—and violates it, not for any narrow technical reason, but for considerations that touch rights so basic to our society that, after the Civil War, their protection against invasion by the States was safeguarded by the Constitution. This is to me a sufficient and conclusive ground for reaching the Court's result.