DECISION
In this case the Cranston School Committee (hereinafter simply "the Committee") moves pursuant to G.L. 1956 (1986 Reenactment) § 28-9-18 to vacate an arbitrator's award. Cranston Teachers' Alliance (hereinafter simply "the Alliance") moves to confirm the award pursuant to § 28-9-17. On May 4, 1995 a duly designated and qualified arbitrator made the following award:
 "The discharge of Michael McGuire was not for just cause. There was, however, just cause to suspend McGuire for one school year.
 As remedy for this violation, the discharge of McGuire shall be reduced to a one year suspension for the 1994-1995 school year without back pay or benefits.
 He shall be reinstated to his former position in the 1995-1996 school year, with the loss of one year's seniority for the 1994-1995 school year."
After five days of hearings and considering briefs from both parties the arbitrator drew the following mixed conclusions of fact and law:
 "This case reveals a complex web of relations between a culinary arts teacher, whom I judge to be high spirited but sadly immature, and a particularly immature, female student who has had a history of adjustment problems and an out-of-the-ordinary need for affection.
 This is not, in my view, a simple case of whether McGuire touched Tarvis's bottom as an act of sexual aggression or whether he touched her at all. The record, viewed as a whole, does not show that he did. I believe that Tarvis may have misinterpreted a gesture that McGuire made or that the incident simply did not occur.
 Nevertheless, it is as plain as plain can be that McGuire's unprofessionally casual, excessively friendly relations with Tarvis and other students created a permissive environment in which words, gestures and actions may have been easily misunderstood. As a teacher he should have exercised far more restraint and care about his behavior — actual and perceived. He must bear full responsibility for the confusing circumstances and ambiguous signals in his relations with Tarvis. But his proven conduct did not justify his discharge.
 * * *
 Accordingly, while I find that discharge was excessive and unjustified discipline for McGuire's conduct towards Tarvis, I find that his accepting her expressions of affection — hugs, kisses and back rubs — was, indeed, a serious offense and an abuse of his authority and trust as a teacher.
 I will direct that the discharge be reduced to a suspension without pay or benefits for the 1994-1995 school year. He shall be reinstated to his former position in the 1995-1996 school year with the loss of seniority for the year of his suspension."
Since the parties have submitted their disagreement as to what happened between the teacher and his pupils to the arbitrator and since his pure fact-finding is a reasonable evaluation of the evidence, the parties are bound by the facts as he found them to have been proved by the credible evidence submitted to him. See Vose v. R.I. Brotherhood of CorrectionalOfficers. 587 A.2d 913, 914 (R.I. 1991). Accordingly, any suggestion by the Committee that the teacher was guilty in fact of any other misconduct than that which the arbitrator found is misplaced and inappropriate.
The issue squarely presented in this case is whether or not the arbitrator was authorized to substitute his judgment for that of the Committee as to whether the misconduct of the teacher as found by the arbitrator constituted "just cause" to dismiss him pursuant to § 16-12-6 or pursuant to some provision of the collective bargaining agreement. The further issue presented is whether or not the Committee is barred from questioning the arbitrator's assertion of that authority, even if he was mistaken as a matter of law, by its having unconditionally participated in the arbitration.
The collective bargaining agreement, itself, does not deal directly with the Committee's authority to terminate the teacher. Two provisions indirectly refer to termination of employment in other contexts. The arbitrator cited ARTICLE XV-SENIORITY-STAFF, paragraph 6.a. which reads, "6. Seniority shall be considered broken for the following reasons: a. Discharge or termination for cause;" and ARTICLE XVIII-TEACHER EVALUATION, E: "No teacher will be disciplined, reprimanded, reduced in rank or compensation, or deprived of any professional advantage without just cause." Although he never expressly did so, it would appear that he construed those provisions of the collective bargaining agreement to authorize the Committee to discharge or terminate a teacher for just cause.
Section 16-13-3 specifically provides in pertinent part that no tenured teacher, like the one in this case, shall be dismissed except for good and just cause. Any such teacher who is so dismissed is entitled under § 16-13-4 to prior notification of the cause of dismissal, a due process hearing before the full school committee, appeal to the state department of elementary and secondary education, and judicial review in this Court.
The Committee argues that the relief sought by the teacher is within the exclusive jurisdiction of state educational authorities pursuant to §§ 16-13-4, as well as 16-39-2 and16-39-3. It contends that, even though it did not raise this objection prior to submitting to arbitration, the question was therefore not subject to arbitration. The Alliance argues that the Committee's claim is one of a failure of substantive arbitrability which according to § 28-9-18(a)(3) must be raised under the conditions set forth in § 28-9-13. These provisions have been held to mean that a party who has participated in arbitration proceedings is not permitted to seek to have the award vacated because the controversy was not arbitrable.Coventry Teachers Alliance v. Coventry School Committee,417 A.2d 886 (1980).
In addition, the rights of appeal provided in § 16-13-4
belong only to the teacher, who may or may not choose to exercise those rights. Nothing in the section leads to the conclusion that they were intended to be exclusive. The rights of appeal to the commissioner in § 16-39-2 is plainly permissive in that any person aggrieved by a school committee decision "may" appeal to the commissioner. Furthermore, § 16-39-5 provides specifically that nothing contained in Chapter 39 of Title 16 should be so construed as to deprive any aggrieved party of any legal remedy.See Demers v. Shehab, 101 R.I. 417, 224 A.2d 380 (1966), cert. den. 386 U.S. 966, 87 S.Ct. 1047, 18 L.Ed.2d 116 (1967).
The Committee's reliance on School Committee of Johnston v.Johnston Federation of Teachers, 652 A.2d 976 (R.I. 1995) is misplaced for three reasons. In the first place, that case dealt with the dismissal of a non-tenured teacher and reference to a tenured teacher was gratuitous. Also, the case did not hold that the appeal procedure under § 16-13-4 precluded arbitration, nor did Jacob v. Burke, 110 R.I. 661, 296 A.2d 456 (1972) (Jacob I), on which the Johnston court relied. Furthermore, it is not disputed that the arbitrator applied the same standard of just cause for dismissal as is set out in § 16-13-4. The Committee did not bargain away any standard. In fact, it could be argued that the committee bargained nothing regarding dismissal. In spite of the Committee's statutory power and the limitation on its exercise, the arbitrator, at least impliedly held, that the Committee did reiterate that power and the limitation in its written agreement with the Alliance.
In that posture of the case, this Court must confront the doctrine announced in State v. National Association of GovernmentEmployees ("NAGE"), 554 A.2d 117 (R.I. 1988) and the effect of the amendment of § 28-9-1 enacted in 1990. The NAGE case stands for the proposition that where a public employer is empowered under a collective bargaining agreement to discharge an employee for just cause, once an arbitrator has determined that just cause for imposition of discipline existed, any further determination by the arbitrator will be made in disregard of the agreement and may be vacated by the court under § 28-9-18, as a manifest disregard of the provisions of the agreement.
On July 12, 1990 the General Assembly enacted P.L. 1990, Ch. 378, § 1 which amended § 28-9-1 by adding the following sentence:
 "Unless the parties agree otherwise in writing,
in the arbitration of matters relating to the disciplining of employees, including but not limited to, termination, suspension or reprimand, the arbitrator shall have the authority to modify the penalty imposed by the employer and/or otherwise fashion an appropriate remedy." (Emphasis supplied.)
The NAGE doctrine was followed and applied by the Supreme Court in Rhode Island Laborers' District Council v. State,592 A.2d 144, 146 (R.I. 1991) after the enactment of P.L. 1990, Ch. 378 to an arbitration which was decided before the effective date of the amendment. The Alliance argues that the legislative intent in the enactment of Chapter 378 was to repeal the NAGE doctrine by statute. The timing is, of course, highly suggestive. The NAGE
doctrine, however, does not prohibit all modifications by an arbitrator of any punishment imposed by any employer on any employee under a collective bargaining agreement, but only those reduced penalties imposed both where the agreement authorizes termination for just cause and where the arbitrator has found just cause for imposing some discipline. The NAGE doctrine also apparently applies only where the written agreement authorizes a governmental employer to dismiss a public employee for just cause.
In City of Pawtucket v. Rhode Island Council 94, AFL-CIO,Local 1012, 657 A.2d 166 (R.I. 1995) an evenly divided Supreme Court affirmed an application by this Court of the NAGE doctrine. By virtue of the City of Pawtucket case the NAGE doctrine still clings to judicial life and the wound inflicted by Chapter 378 may not be mortal after all. Accordingly, the learned decision of Mrs. Justice Savage of this Court in the City of Pawtucket case deserves careful consideration. As here, the arbitrator in that case found just cause to impose discipline on a public employee, but reduced the discharge imposed by the governmental employer to a two week suspension. Judge Savage concluded that under the NAGE
doctrine the arbitrator had exceeded his authority in violation of § 28-9-18.
She was thereupon confronted by the Union's argument, as is argued here, that the amendment to 28-9-1 overruled the NAGE
doctrine. She found that the amendment applied to the case before her. She then stated that the issue before her was whether the agreement, under which the grievance was arbitrated, was an agreement between the parties that limited the arbitrator's power to modify the penalty imposed by the governmental employer. Put another way, she concluded that the Court, and not the arbitrator, was empowered to decide whether the "Unless" clause in Chapter 378 was satisfied.
She held that the amendment did not overrule the NAGE
doctrine, but codified it. The NAGE doctrine holds that the contractual power in a governmental body to terminate a public employee for just cause is just such an agreement in writing to limit an arbitrator's power to modify the employer's choice of disciplinary punishment as is mentioned in the statute. Accordingly, she found as a matter of law that the parties had "otherwise" agreed in writing, and the arbitrator did not enjoy the statutory authority to modify the penalty. Under the circumstances she applied the NAGE doctrine and concluded that the arbitrator had exceeded his powers.
Since the "Unless" clause as enacted is palpably ambiguous, it permits the construction applied by Judge Savage. The General Assembly could have stated clearly what it meant by the language "agree otherwise in writing." It could have expressly included an agreement according a governmental employer the right to terminate a public employee for just cause, which the NAGE
doctrine had held to be a limitation by agreement on the arbitrator's powers. It could have modified the verb "agree" with adverbs such as "expressly", or "specially" or the like, so as to preclude agreements by implication from writings or arising out of the construction or interpretation of writings. It could have omitted the "Unless" clause altogether, since, if parties truly agree otherwise in writing, either party would have the power to obtain a stay of any arbitration of the nature of any discipline imposed. Unless it is a power which may not be bargained away. This Court concurs with her construction.
The Alliance argues that the NAGE doctrine does not apply in this case, because unlike all the cases cited, in which the doctrine has been applied, the arbitrator here did not find the employee had engaged in the conduct which the Committee alleged to be the grounds for his dismissal. In all the other cases the arbitrator had found that just cause existed for discipline because the employee had engaged in the specific misconduct of which he or she had been accused. Nevertheless, in this case the arbitrator did find that the teacher's misconduct "was, indeed, a serious offense and an abuse of his authority and trust as a teacher." Concededly this misconduct is not as reprehensible as the felonious misconduct which was the reason alleged for his dismissal. But, the NAGE doctrine does not depend on the arbitrator's finding that a public employee is guilty of the precise misconduct which the government alleges to be the just cause for termination. It applies whenever an arbitrator finds that there is just cause for any discipline.
The Alliance argues, once again, that by submission of this grievance to arbitration without seeking a pre-arbitration stay of arbitration of the question of the type or degree of discipline to be imposed, if the arbitrator found just cause, the Committee is barred by § 28-9-13 from raising the issue in a post-arbitration motion under § 28-9-18(a)(3). The short answer is that NAGE, itself, as well as its progeny, are all post-arbitration judicial proceedings to vacate awards where the government did participate in arbitration, just as in this case now before the Court.
The Committee advances other grounds for vacating the award which deserve consideration, even if the NAGE doctrine did not survive Chapter 378. It argues that the award is irrational and violates the public policy of this State. The award is said to be irrational, because no rational person would permit a person guilty of the kind of "serious offense" found by the arbitrator to return to a classroom, where he and his students would be once again in the same relationship vis-a-vis one another as led to the "serious offense."
The law of negligence defines a reasonable person as one who exercises ordinary prudence to prevent or avoid harm from foreseeable risks. The risk of harm to pupils in the care of this "high spirited but sadly immature" culinary arts teacher, who "exhibited extraordinarily poor judgment," in permitting a troubled pupil of the opposite sex to kiss him, hug him and rub his back, seems self-evident. Is it rational to expect that one year away from teaching with an undetermined economic loss will change this teacher's personality? Can reasonable minds truly differ?
The teacher was ordered in other proceedings to undergo counselling. The arbitrator does not disclose whether he had any report of the results of that counselling, nor did he have any evidence that one year would be enough time for the teacher to rehabilitate his behavior.
One index of an irrational decision is that the decider offers no rationale to justify the decision. We are asked to accept on faith the arbitrator's determination that the suspension without pay for one year with loss of seniority bears some rational relationship to the gravity of this teacher's offense. This Court respectfully declines to be the instrumentality of the return of this employee to a high school culinary arts classroom.
Finally, the Committee argues that the award violates the clearly expressed public policy of the State. It has long been a constitutional duty of the State government "to promote public schools * * * and to adopt all means which it may deem necessary and proper to secure to the people the advantages and opportunities of education * * *" Constitution of the State ofRhode Island and Providence Plantations, Art. XII Of Education,Section 1; see also City of Pawtucket v. Sundlun, Nos. 94-199-A, etc. (Slip Op. July 20, 1995) That constitutional duty has been delegated to the school committees of the several cities and towns and regional districts by the several statutes codified in Title 16, Education, of the General Laws of 1956, as reenacted in 1988. Section 16-21-17, for example, requires that all schools shall have a school health program which provides for the organized direction and supervision of a healthful schoolenvironment, health education, and services. Other sections of Chapter 21, Health and Safety of Pupils, demonstrate a clear policy of governmental responsibility for the health and safety of school children. Chapter 22, Curriculum, requires that all children in grades one through twelve receive instruction in health. In addition § 16-12-3 specifically provides:
 "Every teacher shall aim to implant and cultivate in the minds of all children committed to his care the principles of morality and virtue."
These statutes and others articulate a clear public policy that school committees, as bodies of government, not only have such authority as is necessary and proper to the exercise of their governmental powers but that they also have a public duty to care for the pupils entrusted to them for education. That responsibility cannot be limited to the physical well-being of such pupils but most include their psychological health. That responsibility must also extends to the development of their moral health.
Who is to say that the authority of the chief judge of one of our courts, as was involved in Rhode Island Laborers DistrictCouncil v. State, supra, or the need for adequate security at our correctional facilities, as was the case in Vose v. Brotherhoodof Correctional Officers, supra, is a more urgent governmental concern than the physical, mental and moral health of the children the law compels to go to school for 180 days each year?
In United Paperworkers International Union, AFL-CIO v. Misco,Inc., 484 U.S. 29, 98 L.Ed.2d 286, 108 S.Ct. 364 (1987) the United States Supreme Court held:
 "A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy. W.R. Grace Co. v Rubber Workers, 461 U.S. 757, 766, 76 L Ed 2d 298, 103 S Ct 2177 (1983); Hurd v Hodge, 334 U.S. 24, 34-35, 92 L Ed 1187, 68 S Ct 847 (1948). That doctrine derives from the basic notion that no court will lend its aid to one who founds a cause of action upon an immoral or illegal act, and is further justified by the observation that the public's interests in confining the scope of private agreements to which it is not a party will go unrepresented unless the judiciary takes account of those interests when it considers whether to enforce such agreements. E.g., McMullen v Hoffman, 174 U.S. 639, 654-655, 43 L Ed 1117, 19 S Ct 839 (1899); Twin City Pipe Line Co. v Harding Glass Co., 283 U.S. 353, 356-358, 75 L Ed 1112, 51 S Ct 476, 83 ALR 1168 (1931). In the common law of contracts, this doctrine has served as the foundation for occasional exercises of judicial power to abrogate private agreements.
 In W.R. Grace, we recognized that `a court may not enforce a collective-bargaining agreement that is contrary to public policy,' and stated that `the question of public policy is ultimately one for resolution by the courts.' 461 US, at 766, 76 L Ed 2d 298, 103 S Ct 2177. We cautioned, however, that a court's refusal to enforce an arbitrator's interpretation of such contracts is limited to situations where the contract as interpreted would violate `some explicit public policy' that is `well defined and dominant, and is to be ascertained "by reference to the laws and legal precedents and not from general considerations of supposed public interests."' Ibid. (quoting Muschany v United States, 324 U.S. 49, 66, 89 L Ed 744, 65 S Ct 442 (1945))." 484 U.S., at 42-43.
See also, City of Warwick v. Boeng Corporation, 472 A.2d 1214, 1218 (R.I. 1984).
The Committee is not only the employer of its teachers. It is also the agency of government charged with responsibility for the physical, mental and moral health of the pupils in its school system. While it can bargain away its rights with respect to the conditions of employment of its teachers, surely it cannot be permitted to bargain away its governmental responsibilities for the health and safety of its pupils. It violates the clear public policy of this State to compel the Committee to expose pupils in one of its schools to the plainly foreseeable risk of harm from the classroom presence of a person, whose misconduct, as found to have been proved by the arbitrator, is unacceptable to it.
For all of the foregoing reasons the award of the arbitrator will be vacated and the motion to confirm the award will be denied.