22 So.3d 711 (2009)
JAYLENE, INC.; Find U. Christiansen a/k/a Find Christiansen; Arlene Christiansen a/k/a Arlene Angus Christiansen; Candansk, LLC; Dansk Management, Inc.; American Care Real Estate Holdings, LLC; 1521030 Ontario, Inc.; Arfind America, Inc.; ACMC-CNH, Inc.; Senior Management Services, Inc.; Benjamin Atkins; Marya Morrison; Jacqueline F. Hurt a/k/a Jacqueline Francis Hurt; Kathleen Sylvia; Paul Prybylski a/k/a Paul John Prybylski; Barbara Gallagher a/k/a Barbara Louise Gallagher; Lynn Taggart a/k/a Lynn Marie Moser Taggart; Kim Gibb a/k/a Kimberly Ann Gschwind Gibb; Suzanne Wadlin a/k/a Suzanne Kathryn Wadlin and John Ricardo (as to Carrington Place a/k/a Carrington Place Care Center f/k/a Carrington Place Convalescent Center), Appellants,
v.
Marguerite STEUER, by and through Victoria PARADISE, her Attorney-In-Fact, Appellee.
No. 2D07-5305.
District Court of Appeal of Florida, Second District.
November 13, 2009.
*712 Mara B. Levy and Mark B. Hartig of McCumber, Daniels, Buntz, Hartig & Puig, P.A., Tampa, for Appellants Jaylene, Inc.; Find U. Christiansen a/k/a Find Christiansen; Arlene Christiansen a/k/a Arlene Angus Christiansen; Candansk, LLC; Dansk Management, Inc.; 1521030 Ontario, Inc.; Arfind America, Inc.; Benjamin Atkins; Marya Morrison; Jacqueline F. Hurt a/k/a Jacqueline Francis Hurt; Kathleen Sylvia; Paul Prybylski a/k/a Paul John Prybylski; Barbara Gallagher a/k/a Barbara Louise Gallagher; Lynn Taggart a/k/a Lynn Marie Moser Taggart; Kim Gibb a/k/a Kimberly Ann Gschwind Gibb; and John Ricardo (as to Carrington Place a/k/a Carrington Place Care Center f/k/a Carrington Place Convalescent Center).
Thomas A. Valdez of Quintairos, Prieto, Wood & Boyer, P.A., Tampa, for Appellant Suzanne Wadlin a/k/a Suzanne Kathryn Wadlin.
Shirin M. Vesely and Brandon S. Vesely of Keane, Reese, Vesely & Gerdes, P.A., St. Petersburg, for Appellant American Care Real Estate Holdings, LLC.
No appearance for Appellants ACMC-CNH, Inc., and Senior Management Services, Inc.
Isaac R. Ruiz-Carus and Blair N. Mendes of Wilkes & McHugh, P.A., Tampa, and Susan B. Morrison of Law Offices of Susan B. Morrison, P.A., Tampa, for Appellee.
PER CURIAM.
As evidenced by the recent cases involving arbitration provisions in nursing home admission contracts, the industry appears to favor arbitration as a means of settling disputes with its clients. See ManorCare Health Servs., Inc. v. Stiehl, 22 So.3d 96, 104 n. 7 (Fla. 2d DCA 2009) (Altenbernd, J., concurring) (citing over thirty-five written opinions by Florida appellate courts addressing nursing home arbitration); Blankfeld v. Richmond Health Care, Inc., 902 So.2d 296, 307 n. 17 (Fla. 4th DCA 2005) (en banc) (Farmer, C.J., concurring) (citing nursing home arbitration cases from each of the other district courts of appeal in Florida). In many instances, nursing home residents or their agents agree to such provisions initially, but they later oppose the provisions when compelled to submit their particular claims to arbitration. This is one such case.
When Marguerite Steuer was admitted to Carrington Place Convalescent Center, the admission contract was executed on her behalf by Victoria Paradise pursuant to a durable power of attorney. The contract contained a provision requiring the *713 parties to submit disputes to binding arbitration "administered" by the National Health Lawyers Association ("NHLA," now known as the American Health Lawyers Association). Later, Paradise filed suit on Steuer's behalf, alleging negligence and violation of the residents' rights enumerated in chapter 400, Florida Statutes (2001). Steuer later died, whereupon the complaint was amended to include wrongful death claims.
The nursing home moved to compel arbitration, and it now appeals the nonfinal order denying same. The circuit court ruled that Steuer's durable power of attorney did not grant Paradise authority to agree to arbitration. The court also held that the arbitration agreement was void as against public policy because liability limitations contained in the NHLA rules prohibited remedies that otherwise are available to nursing home residents under chapter 400. We conclude that the durable power of attorney was sufficiently broad to confer upon Paradise authority to bind Steuer to the arbitration provision in the admissions contract. See Jaylene, Inc. v. Moots, 995 So.2d 566 (Fla. 2d DCA 2008), review denied, 8 So.3d 1134 (Fla. 2009). Therefore, we disagree with the court's first ground for denying the nursing home's motion to compel arbitration.
Further, although we share the circuit court's concern over the limits of liability, we also must disagree with its second reason for denying the motion. When concluding that the arbitration agreement was void as against public policy, the court rejected the nursing home's argument that the arbitrator should decide this question in the first instance. The circuit court apparently failed to appreciate that this court has held consistently with the nursing home's position. See Rollins, Inc. v. Lighthouse Bay Holdings, Ltd., 898 So.2d 86, 87 (Fla. 2d DCA 2005) (holding that arbitrator must, in the first instance, decide whether arbitration provision is unenforceable because some of its terms limit remedies). Rather, the circuit court focused on dicta in Bland ex rel. Coker v. Health Care & Retirement Corp. of America, 927 So.2d 252 (Fla. 2d DCA 2006), and further distinguished it by comparing the limitations at issue here with the limitations at issue in Bland and Blankfeld, 902 So.2d 296. But the court overlooked the legal holding in Rollins and erred by failing to apply it.
Bound by Rollins, we must reverse and remand for the circuit court to grant the nursing home's motion to compel arbitration. We note that we are in conflict with decisions by the First, Fourth, and Fifth Districts holding that the trial court initially must determine whether an arbitration agreement's limitation on statutory remedies renders the agreement unenforceable on public policy grounds. See, e.g., Alterra Healthcare Corp. v. Estate of Linton ex rel. Graham, 953 So.2d 574 (Fla. 1st DCA 2007); Alterra Healthcare Corp. v. Bryant, 937 So.2d 263 (Fla. 4th DCA 2006); SA-PG-Ocala, LLC v. Stokes, 935 So.2d 1242 (Fla. 5th DCA 2006).
Reversed and remanded.
DAVIS and VILLANTI, JJ., Concur.
NORTHCUTT, J., Concurs with opinion.
NORTHCUTT, Judge, Concurring.
I concur in this result because it is dictated by this court's decision in Rollins, 898 So.2d at 87. However, although I believe there is much to recommend the Rollins approach in cases involving public policy defenses to the enforcement of arbitration agreements, I am vexed by concerns about its efficacy under Florida's arbitration scheme.
*714 My discussion must begin with the principle that the validity of an arbitration agreement can be challenged only by asserting defenses that are generally applicable to all contractsdefenses such as fraud, duress, or unconscionability. See Global Travel Mktg., Inc. v. Shea, 908 So.2d 392, 397 (Fla.2005). One well-established defense to the enforcement of a contract is that the contract violates public policy. See E. Allan Farnsworth, Unenforceability on Grounds of Public Policy, in Contracts ch. 5 (2d ed. 1990). This defense is firmly rooted in common law, and because it protects the interests of society at large as well asand sometimes contrary to-those of the contracting parties, it is an important aspect of the courts' authority. As far back as 1775, Lord Mansfield was expressing the view that an agreement may be void on grounds of public policy, stating: "No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act." Id. § 5.1 at 347 (quoting Holman v. Johnson, 1 Cowp. 341, 343, 98 Eng. Rep. 1120, 1121 (1775)). An early Florida case recognized this defense to contract enforcement, citing the principle "ex turpi causa non oritur actio" to explain the law's reluctance to enforce contracts in violation of public policy. Town of Boca Raton v. Raulerson, 108 Fla. 376, 146 So. 576, 577 (1933). Translated, the maxim means "`from an immoral consideration an action does not arise,'" which "expresses the principle that a party does not have a right to enforce performance of an agreement founded on a consideration that is contrary to the public interest." Black's Law Dictionary 607 (7th ed. 1999).
The United States Supreme Court has applied the public policy contract defense to arbitration awards under collective bargaining agreements in labor cases.
A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy. W.R. Grace & Co. v. Rubber Workers, 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983); Hurd v. Hodge, 334 U.S. 24, 34-35, 68 S.Ct. 847, 92 L.Ed. 1187 (1948). That doctrine derives from the basic notion that no court will lend its aid to one who founds a cause of action upon an immoral or illegal act, and is further justified by the observation that the public's interests in confining the scope of private agreements to which it is not a party will go unrepresented unless the judiciary takes account of those interests when it considers whether to enforce such agreements. E.g., McMullen v. Hoffman, 174 U.S. 639, 654-655, 19 S.Ct. 839, 43 L.Ed. 1117 (1899); Twin City Pipe Line Co. v. Harding Glass Co., 283 U.S. 353, 356-358, 51 S.Ct. 476, 75 L.Ed. 1112 (1931). In the common law of contracts, this doctrine has served as the foundation for occasional exercises of judicial power to abrogate private agreements.
United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 42, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) (parallel citations omitted). As mentioned, Misco involved a collective bargaining agreement. To date, the Supreme Court has not applied the public policy defense to an arbitration award in a commercial setting, but the federal circuit courts of appeal have done so. See Stephen L. Hayford, Unification of the Law of Labor Arbitration and Commercial Arbitration: An Idea Whose Time Has Come, 52 Baylor L.Rev. 781, 873-74 (2000) (collecting and discussing commercial arbitration cases applying several nonstatutory grounds to vacate arbitration *715 awards including claim of public policy violation).
As can be seen, our contracts jurisprudence recognizes that a court has common law authority to determine that an arbitration agreement is unenforceable because its liability limitations frustrate the public policy underlying a remedial statute. Under Rollins, however, the question of the efficacy of the defense in a particular case initially must be referred to the arbitrator. One advantage in that sequence is that it honors the parties' agreement to arbitrate by first sending the case to arbitration and later requiring deference to the arbitrator's findings of fact and interpretation of the contract. See Misco, 484 U.S. at 37-38, 108 S.Ct. 364 ("Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept.").
Further, the Rollins approach avoids differing results in cases based only on where the drafter placed limitations on damages. The U.S. Supreme Court has explained that an arbitration agreement is severable from the contract as a whole; when deciding whether there is a valid agreement to arbitrate, a court reviews only the terms of the arbitration provision itself. Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006) (rejecting distinction between void and voidable contracts and holding that while courts decide challenges to validity of arbitration agreements, arbitrators must decide challenges to general provisions in the contract); Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (holding that when deciding whether a valid arbitration agreement exists, the court must focus solely on the arbitration agreement and not on the contract as a whole). Thus, if limits on damages are set forth elsewhere in the contract, they play no role in a court's decision whether to send the case to arbitration. See Estate of Linton, 953 So.2d at 577 (rejecting argument that challenge to limits on liability was actually challenge to admissions contract as a whole, which would present question for arbitrator, when limits were expressly incorporated by reference into arbitration provision); see also Bryant, 937 So.2d 263 (same, distinguishing Beaver Coaches, Inc. v. Revels Nationwide R.V. Sales, Inc., 543 So.2d 359 (Fla. 1st DCA 1989), because limits there were not contained within arbitration provision); cf. Christopher B. Hopkins, Emerging Trends and Conflicts in the Enforcement of Arbitration Clauses, 24 No. 4 Trial Advoc. Q. 44, 46 (2005) (noting, after discussing cases invalidating arbitration agreements on public policy grounds, that "creative drafting also might provide a solution if the party developing a contract simply sets out the arbitration provision as a separate document thereby preventing a valid arbitration clause from being tainted by an allegedly `illegal' contract"). On the other hand, the drafting party may place the liability limitations in the arbitration clause itself in order to ensure that the arbitrator is bound. Cf. Beaver Coaches, Inc. v. Revels Nationwide R.V. Sales, Inc., 543 So.2d 359, 361 (Fla. 1st DCA 1989) (rejecting trial court's conclusion that contract limits outside of arbitration clause would govern arbitrator's award and stating that arbitrator was bound only by terms of arbitration agreement).
The Rollins approach also avoids differing results that might depend on the presence or absence of a severance clause and the court's application of the severability principle independent of the agreement's provisions. Compare Lacey v. Healthcare & Ret. Corp. of Am., 918 So.2d 333, 335 (Fla. 4th DCA 2005) (denying arbitration *716 when limits in arbitration agreement found to violate public policy, agreement lacked severance clause, and "arbitration and limitation of liability agreement" title suggested that limits went to essence of agreement), with Gessa ex rel. Falatek v. Manor Care of Fla., Inc., 4 So.3d 679 (Fla. 2d DCA 2009) (concluding that limitation provision was severable even when agreement lacked specific severability clause), and Shotts v. OP Winter Haven, Inc., 988 So.2d 639 (Fla. 2d DCA 2008) (same).
As can be seen from the foregoing, arbitration law has been developing in such a way that contracting parties must assess the location of damages provisions in their contract and the potential for severance when they wish to make what should be a simple choice of forum for resolving disputes. Certainly, it is unrealistic to expect that prospective nursing home residents or other consumers who are presented with myriad contract documents to enter facilities, buy cars, and so forth, would have a full understanding of the significance of these permutations in the circumstances under which such agreements are signed. By enforcing the parties' agreement to arbitrate while maintaining the judicial power to review the public policy defense to an arbitration award, a court would preserve and honor the core purpose of arbitrationto achieve a speedy resolution of claims. At the same time, it would treat all contracts alike, regardless of where the disputed provisions appeared in them.
Finally, by initially referring the public policy defense to the arbitrator, the court would also avoid questions that may never be ripe for decision. Rollins explained that the effect of the contractual limitations at issue there could not be determined at the beginning of the case, when the right to arbitration was invoked, because "at this stage in the proceedings we can only speculate whether [the appellee] will ever be affected by the remedial limitations of which it complains." 898 So.2d at 89; see also Bland, 927 So.2d at 258 ("The arbitrator can assess the public policy concerns in the context of a fully developed factual record. Conceivably, the evidence presented in arbitration could render these concerns moot."). Indeed, the court itself would be in a better position to evaluate a potential public policy violation after the facts are established. Cf. David M. Glanstein, A Hail Mary Pass: Public Policy Review of Arbitration Awards, 16 Ohio St. J. on Disp. Resol. 297, 311 (2001) ("The public policy exception is rooted in the common law doctrine that contracts which violate law or policy should not be enforced; therefore, only where enforcement of the award materially impairs public policy in a way proscribed by that policy, should deference to arbitrators' authority be withdrawn. This approach seems most consistent with Misco.") (emphasis supplied).
For the foregoing reasons, I believe that courts should avoid addressing alleged violations of public policy at the beginning of the arbitration process. But this raises a significant question: If not then, when? Rollins' holding that the arbitrator must address the defense "in the first instance" obviously assumed the existence of some mechanism for eventually placing the issue before the court. But it is not clear to me that existing Florida law provides for such.
Section 682.13, Florida Statutes (2008), authorizes a narrow list of grounds for vacating an arbitration award.
(1) Upon application of a party, the court shall vacate an award when:
(a) The award was procured by corruption, fraud or other undue means.
(b) There was evident partiality by an arbitrator appointed as a neutral or corruption in any of the arbitrators or umpire *717 or misconduct prejudicing the rights of any party.
(c) The arbitrators or the umpire in the course of her or his jurisdiction exceeded their powers.
(d) The arbitrators or the umpire in the course of her or his jurisdiction refused to postpone the hearing upon sufficient cause being shown therefor or refused to hear evidence material to the controversy or otherwise so conducted the hearing, contrary to the provisions of s. 682.06, as to prejudice substantially the rights of a party.
(e) There was no agreement or provision for arbitration subject to this law, unless the matter was determined in proceedings under s. 682.03 and unless the party participated in the arbitration hearing without raising the objection.
§ 682.13(1). Significantly, the statute concludes by declaring that "the fact that the relief was such that it could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm the award." Id. The Florida Supreme Court has instructed that "in the absence of one of the five factors set forth in the statute, neither a trial court nor a district court of appeal has the authority to overturn the award." Schnurmacher Holding, Inc. v. Noriega, 542 So.2d 1327, 1328 (Fla.1989).
The question, then, is whether the foregoing statutory list would permit a court to vacate an arbitration award if it determined that the arbitration agreement was unenforceable because it violated public policy.
Reference to federal law, while somewhat helpful, does not furnish the answer. Under the Federal Arbitration Act ("FAA"), the enumerated grounds to vacate an award are likewise limited and include only the following:
(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration
(1) where the award was procured by corruption, fraud, or undue means;
(2) where there was evident partiality or corruption in the arbitrators, or either of them;
(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.
9 U.S.C. § 10(a). However, in contrast to Florida courts' strict adherence to the statutory criteria for vacating arbitration awards, the federal circuit courts of appeals have also reviewed awards on other grounds, including violations of public policy. See Hayford, supra at 873 (collecting cases). "[T]he one glaring void in the law of commercial arbitration is the absence of definitive Supreme Court guidance as to the grounds for vacatur of awards." Id. at 880. In a recent case, the Supreme Court held that 9 U.S.C. §§ 10 and 11 respectively "provide the FAA's exclusive grounds for expedited vacatur and modification." Hall St. Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576, 128 S.Ct. 1396, 1403, 170 L.Ed.2d 254 (2008). That case, however, involved the FAA's procedure for expedited review in federal court. Id. at 1402 ("An application for any of these orders [confirming, vacating, or modifying an arbitration *718 award] will get streamlined treatment as a motion, obviating the separate contract action that would usually be necessary to enforce or tinker with an arbitral award in court."). And even there, the Supreme Court noted that neither party raised "an independent state-law contract claim or defense." Id. at 1402 n. 3.
For purposes of this discussion, the glaring difference between the federal arbitration statutes and Florida's is that the FAA lacks the Florida statute's admonition that "the fact that the relief was such that it could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm the award." § 682.13(1). Thus, unlike federal courts, Florida courts are statutorily confined to the vacatur grounds listed in the statute.
Which of those grounds would include a violation of public policy is unclear. If a liability limitation appears in the arbitration clause, an award that is inconsistent with that limitation arguably would exceed the arbitrator's powers, which provides a statutory basis for vacating the arbitration award. See § 682.13(1)(c). In that case, the court likely would have authority to consider a public policy challenge to the limitation when determining whether to vacate the award. But if the liability limit appears elsewhere in the underlying contract, an arbitration award inconsistent with the limitation arguably would be a mere legal error, unreviewable on a motion to vacate under the statute. See Verzura Constr., Inc. v. Surfside Ocean, Inc., 708 So.2d 994 (Fla. 3d DCA 1998) (noting bar to setting aside arbitration award for error as to law or fact). Perhaps most troubling of all would be a scenario in which the arbitrator's award is consistent with a contractual liability limitation that would be unenforceable for policy reasons in a traditional court proceeding. In that case, under the statute could the plaintiff seek to vacate the award on that ground?
If Rollins is correct and the court does not in the first instance resolve the public policy defense, but yet we are persuaded that the court must at some point rule on the issue, to reconcile Rollins and Schnurmacher Holding we would have to hold that under the statute arbitrators exceed their power when their awards violate public policy. Cf. Hall St. Assocs., 128 S.Ct. at 1404 (noting that "manifest disregard," when used to vacate arbitration award, "may have been shorthand for § 10(a)(3) or § 10(a)(4), the subsections authorizing vacatur when the arbitrators were `guilty of misconduct' or `exceeded their powers'").
Otherwise, it might appear that Rollins is incorrect. And, indeed, it may be when considered in light of Seifert v. U.S. Home Corp., 750 So.2d 633 (Fla.1999). In that case, the Florida Supreme Court encapsulated the three questions a court must answer when faced with a motion to compel arbitration: "(1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived." Id. at 636. Resolution of these questions is a matter of contract interpretation. Id. A court must answer the first question in Seifert by looking only at the arbitration agreement, Prima Paint, 388 U.S. at 404, 87 S.Ct. 1801, but in looking at the arbitration agreement it may consider only general contract defenses, Global Travel Mktg., 908 So.2d at 397. By deferring this issue to the arbitrator, does the court abdicate its responsibility under Seifert to make the threshold determination of whether a valid arbitration agreement exists before compelling arbitration? See Estate of Linton, 953 So.2d at 578 ("The issue of whether the provision violated public policy goes to the first Seifert inquiry: *719 whether there was a valid agreement to arbitrate."). It certainly does if the court is foreclosed from looking at the issue on the back end. If the arbitration agreement truly violates public policy, then an award under the agreement cannot be enforced, and a court would appear to go astray by lending its authority to the enforcement of such an agreement. See Global Travel Mktg., 908 So.2d at 398 ("No valid agreement exists if the arbitration clause is unenforceable on public policy grounds.").
To date, no Florida authority has furnished answers to my questions. I agree with the Rollins approach, and in the instant case I endorse the ruling that is required by Rollins. But, until it becomes clear that a public policy defense may be raised in a statutory motion to vacate an arbitration award, I will continue to have serious reservations.