**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN DOE, a minor, by his mother
and next friend, Jane Doe,
            *Plaintiff-Appellant,*

        and

JOSEPHINE HELELANI PAUAHI
RABAGO,
                    *Intervenor,*

        v.

KAMEHAMEHA SCHOOLS/BERNICE
PAUAHI BISHOP ESTATE; CONSTANCE
LAU, in her capacity as Trustee of
the Kamehameha Schools/Bernice
Pauahi Bishop Estate; NAINOA
THOMPSON, in his capacity as
Trustee of the Kamehameha
Schools/Bernice Pauahi Bishop
Estate; DIANE J. PLOTTS, in her
capacity as Trustee of the
Kamehameha Schools/Bernice
Pauahi Bishop Estate; ROBERT
K.U. KIHUNE, in his capacity as
Trustee of the Kamehameha
Schools/Bernice Pauahi Bishop
Estate; J. DOUGLAS ING, in his
capacity as Trustee of the
Kamehameha Schools/Bernice
Pauahi Bishop Estate,
                *Defendants-Appellees.*

No. 04-15044

D.C. No.
CV-03-00316-ACK

OPINION

Appeal from the United States District Court
for the District of Hawaii
Alan C. Kay, District Judge, Presiding

8921

Argued and Submitted
November 4, 2004—Honolulu, Hawaii

Filed August 2, 2005

Before: Robert R. Beezer, Susan P. Graber, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee;
Partial Concurrence and Partial Dissent by Judge Graber

## COUNSEL

Eric Grant, Sweeney, Davidian, Greene & Grant, L.L.P., Sacramento, California, for the plaintiff-appellant.

Kathleen M. Sullivan, Stanford, California, and David Schulmeister, Cades Schutte, L.L.P., Honolulu, Hawaii, for the defendants-appellees.

Patrick M.K. Richardson, McCracken, Byers & Haesloop, L.L.P., San Mateo, California, for the amici curiae.

## OPINION

BYBEE, Circuit Judge:

Since 1887, the Kamehameha Schools have operated as the charitable legacy of Princess Bernice Pauahi Bishop, the last direct descendant of King Kamehameha I. Private and non-sectarian, the Kamehameha Schools give preference to students who are of native Hawaiian ancestry. As a result of this policy, attendance at the Kamehameha Schools is effectively limited to those descended from the Hawaiian race. The issue considered here is a significant one in our statutory civil rights law: May a private, nonsectarian, commercially operated school, which receives no federal funds, purposefully exclude a student qualified for admission solely because he is not of pure or part aboriginal blood? The parties agree that this is a case of first impression in our circuit.

The plaintiff, John Doe, appeals the district court's grant of summary judgment in favor of defendants, the Kamehameha Schools and the Bernice Pauahi Bishop Estate and its individual trustees. He argues that he was denied entry to the Kamehameha Schools because of his race in violation of 42 U.S.C. § 1981, which forbids racial discrimination in the making and enforcement of contracts. For the following reasons, we agree with Doe and find that the Schools' admissions policy, which operates in practice as an absolute bar to admission for those of the non-preferred race, constitutes unlawful race discrimination in violation of § 1981. Accordingly, we reverse the district court's decision granting summary judgment to the Kamehameha Schools.

I

The facts are not in dispute. The Kamehameha Schools comprises a system of private, nonsectarian schools which are dispersed among the Hawaiian Islands. *See EEOC v. Kamehameha Sch./Bishop Estate*, 990 F.2d 458, 461 (9th Cir. 1993).

The school system was founded in 1887 under a "charitable testamentary trust established by the last direct descendent of [Hawaii's] King Kamehameha I, Princess Bernice Pauahi Bishop." *Burgert v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir. 2000). At the time of her death in 1884, Princess Pauahi Bishop was the largest landowner in Hawai'i, owning approximately one-tenth of the aggregate lands. Her will provided that the bulk of her estate should be placed in a charitable trust "to erect and maintain in the Hawaiian Islands two schools, each for boarding and day scholars, one for boys and one for girls, to be known as, and called the Kamehameha Schools." Will of Bernice Pauahi Bishop, *reprinted in* WILLS AND DEEDS OF TRUST 17-18 (3d ed. 1957) (hereinafter "Pauahi Bishop Will"). *See also Kamehameha Sch./Bishop Estate*, 990 F.2d at 459.

Under the direction of the original trustees, chaired by Pauahi's husband, Charles Reed Bishop, both schools opened shortly after her death; the boys' school in the Fall of 1887 and the girls' in the Fall of 1894. The two schools were consolidated into one coeducational institution during the 1965-66 academic year. Currently, the Kamehameha Schools operate K-12 campuses on three separate islands, Kapalama (O'ahu), Pukalani (Maui), and Kea'au (Island of Hawai'i), enrolling more than 16,000 children annually. While the Schools subsidize much of the educational costs through funds held in trust, annual tuition remains at $1,784 for K-12th grade students, with approximately sixty-five percent of those enrolled receiving some form of financial aid.[1]

Pauahi's will contains several instructions pertaining to the

---

[1]With the forced sale of the Bishop trust lands under the Hawai'i Land Reform Act in the 1980s, *see Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229 (1984), the Schools, which were previously "land rich and cash poor," suddenly had an abundance of working capital. The Bernice Pauahi Bishop Estate is currently one of the world's wealthiest charities, with an estimated worth of $6 billion.

administration of the Kamehameha Schools, none of which establish race as an admissions criteria. She directs that all students attending the Kamehameha Schools should be provided "first and chiefly a good education in the common English branches, and also instruction in morals and in such useful knowledge as may tend to make good and industrious men and women" and, in addition, that "the teachers of said schools shall forever be persons of the Protestant religion." Pauahi Bishop Will at 18-19. *See also Kamehameha Sch./ Bishop Estate*, 990 F.2d at 461 (concluding that the Schools do not fall within any of the three religious exemptions provided in Title VII and, therefore, the failure to consider a non-Protestant teacher on account of her religion was discriminatory). She further instructs that a portion of the trust's annual income should be devoted "to the support and education of orphans, and others in indigent circumstances, giving the preference to Hawaiians of pure or part aboriginal blood." Pauahi Bishop Will at 18. While this racial preference is expressly listed as a criterion for the administration of estate resources charitably directed to orphans and indigents, the Will is notably devoid of any mention of race as a criterion for admission into the Kamehameha Schools. As the Schools' 1885 Prospectus observed: "The noble minded Hawaiian chiefess who endowed the Kamehameha Schools, put no limitations of race or condition on her general bequest. Instruction will be given only in English language, but The Schools will be opened to all nationalities."[2]

Rather than institute race as an admissions prerequisite, Pauahi left to her Trustees the discretion "to regulate the admission of pupils" and "to make all such rules and regula-

---

[2]Similarly, in a February 11, 1897 letter, Charles Bishop noted: "There is nothing in the will of Mrs. Bishop excluding white boys or girls from the Schools . . . ." In a February 20, 1901 letter he further stated: "According to the reading of Clause 13 on Page 8 of the Will as published, the preference to Hawaiians of pure or part aboriginal blood, applies only to education of orphans and others in indigent circumstances."

tions as they may deem necessary for the government" of the Kamehameha Schools. Pauahi Bishop Will at 18. The original trustees determined, however, that it was Pauahi's intent to prefer students of native Hawaiian ancestry. Specifically, the policy articulated by Charles Bishop was that "boys and girls of pure or part aboriginal blood . . . should have preference; that is[,] they should have the first right." Accordingly, the admissions process at Kamehameha currently proceeds in two phases: first, the applicant must demonstrate that he possesses the minimum qualifications necessary to meet the Schools' rigorous academic standards and, second, he must complete an "Ethnic Ancestry Survey" designed to verify his aboriginal blood. The Schools forthrightly admit that as long as there are qualified students who possess at least some native Hawaiian ancestry, they will be admitted before even the most qualified of those who lack aboriginal blood. It is this "Hawaiians first" admissions policy that motivates the instant controversy.

The plaintiff-appellant, John Doe, twice sought admission to the Kamehameha Schools and, having met the academic requirements for admission, was twice determined to be a "competitive applicant." After completing the Ethnic Ancestry Survey, in which he acknowledged that he possessed no aboriginal blood, his application was each time, as expected, denied. Still desiring to attend the Kamehameha Schools, Doe filed suit alleging that the Schools' admissions policy violates 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071. Concluding that the admissions policy constituted a valid race-conscious remedial affirmative action program, the district court entered summary judgment in favor of the Kamehameha Schools and the Bernice Pauahi Bishop Estate. *Doe v. Kamehameha Sch./ Bernice Pauahi Bishop Estate*, 295 F. Supp. 2d 1141, 1172 (D. Haw. 2003). This appeal followed.

## II

Before proceeding to analyze the question presented in this appeal, it is worth clarifying those which are not. Specifically,

the Kamehameha Schools does not contest, and candidly admits, that its admissions process is based upon an express racial classification. *Cf. Rice v. Cayetano*, 528 U.S. 495, 514 (2000) ("Ancestry can be a proxy for race."). The School does not attempt to justify its admissions policy by appealing to a First Amendment right to freedom of association, *see Runyon v. McCrary*, 427 U.S. 160, 176 (1976) ("Invidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections."); nor does it explicitly argue for a relaxed level of scrutiny by appealing to the political nature of classifications premised on membership in a federally recognized Indian tribe. *See Morton v. Mancari,* 417 U.S. 535 (1974) (upholding a Bureau of Indian Affairs hiring preference for Native Americans under rational basis scrutiny due to the unique relationship between the federal government and members of federally recognized Indian tribes). *See also Rice*, 528 U.S. at 518 (declining to extend *Mancari* to uphold a race-based voting restriction for native Hawaiians absent "some beginning premises not yet established in [the Court's] case law"; namely, that Congress "has determined that native Hawaiians have a status like that of Indians in organized tribes"). We are, likewise, not presented with a challenge to the racially discriminatory admissions policy of a public school or a school which accepts federal funding. *See, e.g., Gratz v. Bollinger*, 539 U.S. 244, 275-76 & n.23 (2003) (applying strict scrutiny to a racial preference challenged under the Equal Protection Clause); *Grutter v. Bollinger*, 539 U.S. 306, 343 (2003) (same).

Instead, we are confronted with a question of statutory origin: whether a private school, receiving no federal funds, may legitimately restrict admission to those of the native Hawaiian race. In other words, does the Kamehameha Schools' "Hawaiians first" admissions policy constitute invidious discrimination in violation of § 1981? The district court concluded that it does not. Because the issue is one of law, we review that

decision *de novo. See, e.g., Desir v. Ilchert*, 840 F.2d 723, 726 (9th Cir. 1988) (stating that "questions concerning the requirements of the applicable statutes . . . are questions of law, which we review *de novo*") (internal quotation marks omitted).

### III

**[1]** Because the Kamehameha Schools admits that its admissions process is premised upon an express racial classification, we must first identify the standard of scrutiny that should be applied to proffered justifications for the racially discriminatory program. Two obvious contenders exist: strict scrutiny, such as that used to analyze challenges brought under the Fourteenth Amendment's Equal Protection Clause; or the more deferential form of scrutiny employed to resolve challenges brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* (2004).

If strict scrutiny applies to the plaintiff's § 1981 challenge, the Schools must demonstrate that its admissions program is a "narrowly tailored measure[ ] that further[s] compelling governmental interests." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). On the other hand, if Title VII scrutiny applies to this § 1981 suit, the Schools must merely "present evidence that the plaintiff was rejected, or the other applicant was chosen, *for a legitimate nondiscriminatory reason.*" *Patterson v. McLean Credit Union*, 491 U.S. 164, 187 (1989) (emphasis added).

The plaintiff-appellant argues that strict scrutiny is the only method of review sufficiently rigorous to enforce the substantive commands of § 1981. He urges that although the *McDonnell Douglas* burden-shifting framework and order of proof is frequently applied to § 1981 suits, Title VII's substantive legal standards are inapplicable in this context. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). We dis-

agree. To explain our disagreement, a brief preliminary discussion of the complicated history of § 1981 is useful.

A

Section 1981 was originally enacted pursuant to section two of the Thirteenth Amendment as part of the Civil Rights Act of 1866. Act of Apr. 9, 1866, ch. 31, § 1, 14 Stat. 27. "The principal object of the legislation was to eradicate the Black Codes, laws enacted by Southern legislatures imposing a range of civil disabilities on freedmen." *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 386 (1982). Section 1 of the Civil Rights Act provided:

> That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.

14 Stat. 27. In response to concerns over whether the Thirteenth Amendment authorized such broad legislation, it was later reenacted, after passage of the Fourteenth Amendment, in the Enforcement Act of 1870, sometimes referred to as the Civil Rights Act of 1870. Act of May 31, 1870, ch. 114,

§§ 16, 18, 16 Stat. 144. *See also Hurd v. Hodge*, 334 U.S. 24, 32-33 (1948) (noting that some members of Congress supported the Fourteenth Amendment "in order to eliminate doubt as to the constitutional validity of the Civil Rights Act [of 1866] as applied to the States"); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 436 (1968) (same). The Enforcement Act contained two sections which had very similar effect. Section 18 simply reenacted, literally, § 1 of the 1866 Act:

> *And be it further enacted*, That the act to protect all persons in the United States in their civil rights, and furnish the means of their vindication, passed April nine, eighteen hundred and sixty-five, is hereby reenacted; and sections sixteen and seventeen hereof shall be enforced according to the provisions of said act.

16 Stat. 141, 144 (1870). In addition, the new § 16 enacted much of the substance of the 1866 Act:

> *And be it further enacted*, That all persons within the jurisdiction of the United States shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and none other, any law, statute, ordinance, regulation or custom to the contrary notwithstanding. No tax or charge shall be imposed or enforced by any State upon any person immigrating thereto from a foreign country which is not equally imposed and enforced upon every person immigrating to such State from any other foreign country; and any law of any State in conflict with this provision is hereby declared null and void.

16 Stat. 141, 144 (1870). Section 16 differed from § 1 of the 1866 Act in at least two respects. First, where § 1 of the 1866 Act extended its guarantees to "citizens, of every race and color," § 16 of the 1870 Act protected "all persons." *See United States v. Wong Kim Ark*, 169 U.S. 649, 675 (1898); *Sagana v. Tenorio*, 384 F.3d 731, 737 (9th Cir. 2004), *cert. denied*, 125 S. Ct. 1313 (2005). Second, § 16 of the 1870 Act omitted language contained in the 1866 Act guaranteeing property rights equivalent to those enjoyed by white citizens; this language was reenacted separately in what is now 42 U.S.C. § 1982. In 1874 federal statutory law was codified. Section 1977 of the Revised Code of 1874 is identical with the present § 1981(a), which is prefaced by the caption "Equal rights under the law," and provides the following:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).

Immediately following its passage, what is now § 1981 underwent nearly a century of desuetude during which debate regarding its scope and meaning was generally subsumed by the controversy surrounding the newly ratified Fourteenth Amendment's Equal Protection Clause. Partially owing to lingering uncertainty regarding the scope of the statute and the extent of Congress's authority to prohibit discrimination divorced from state action, § 1981 would not gain independent significance until the late 1960s. *See*, *e.g.*, *Hurd*, 334 U.S. at 31 (declaring that "governmental action" was required in a suit based on the Civil Rights Act of 1866); *The Civil*

*Rights Cases*, 109 U.S. 3, 24-25 (1883) (invalidating the public accommodation provisions of the Civil Rights Act of 1875 as beyond Congress's power to enforce either the Thirteenth or Fourteenth Amendments). With two decisions, however, the Supreme Court did for § 1981 what *Monroe v. Pape*, 365 U.S. 167 (1961), did for 42 U.S.C. § 1983: clarify and resurrect the statute from its prior existence, merely as a device to augment the remedies for previously recognized forms of discrimination, to a litigation tool in its own right with unparalleled theoretical coverage. *See Runyon*, 427 U.S. at 170; *Jones*, 392 U.S. at 423.

In *Jones*, the Court interpreted a companion statute, 42 U.S.C. § 1982, to encompass and prohibit racial discrimination in purely private transactions. 392 U.S. at 423-24. The Court held that the right conferred by § 1982 — the same right to "inherit, purchase, lease, sell, hold, and convey real and personal property" as is enjoyed by white citizens — is secured against interference from both governmental and private actions. *Id.* ("[W]hen Congress provided in § 1 of the Civil Rights Act that the right to purchase and lease property was to be enjoyed equally throughout the United States by Negro and white citizens alike, it plainly meant to secure that right against interference from any source whatever, whether governmental or private."). Thus, relying on the legislative history of § 1 of the Civil Rights Act of 1866, the Court concluded that Congress intended to prohibit "all racial discrimination, private and public, in the sale . . . of property," *id.* at 437, and, further, that this prohibition was within Congress's power under section two of the Thirteenth Amendment "rationally to determine what are the badges and the incidents of slavery, and . . . to translate that determination into effective legislation." *Id.* at 440. Eight years later, in *Runyon*, the Court explicitly found the same result dictated under § 1981.

*Runyon* involved a challenge to two private schools' admissions programs which categorically excluded African-American students. 427 U.S. at 170. Although the schools

received no federal or state aid of any kind, their services "were advertised and offered to members of the general public." *Id.* at 172. Relying on *Jones* and two other recent cases, *see Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975); *Tillman v. Wheaton-Haven Recreation Ass'n*, 410 U.S. 431, 439-40 (1973), the Court concluded that an individual's § 1981 right "to make and enforce contracts" is violated if a private offeror refuses to extend him "the same opportunity to enter into contracts" that he extends to white offerees, solely on the basis of his race. *Runyon*, 427 U.S. at 170-71. According to the Court, the schools' racially exclusive admissions policies constituted "a classic violation of § 1981." *Id.* at 172. The Court found that since it is derived from both the Acts of 1866 and 1870, § 1981 validly reaches private, as well as public, racial discrimination based upon Congress's Thirteenth Amendment powers. *Id.* at 168 n.8, 179 ("Section 1981, as applied to the conduct at issue here, constitutes a[ ] [valid] exercise of federal legislative power under § 2 of the Thirteenth Amendment . . . .").

Thus, together, and more than one hundred years after § 1981's passage, *Jones* and *Runyon* finally dispensed with the state action requirement and held that the Civil Rights Act of 1866 reached purely private acts of discrimination by virtue of Congress's power under section two of the Thirteenth Amendment. How far the Thirteenth Amendment enforcement power and the doctrine of *Runyon* extended, however, remained open.

In the same term that it decided *Runyon*, the Court held that § 1981 prohibits racial discrimination in private employment against white persons as well as nonwhite persons. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976) ("Th[e] cumulative evidence of congressional intent makes clear, we think, that the 1866 statute, designed to protect the 'same right . . . to make and enforce contracts' of 'citizens of every race and color' was not understood or intended to be reduced . . . to the protection solely of nonwhites."). *McDon-*

*ald* involved a claim by two white employees of the Santa Fe Trail Transportation Company who were accused of misappropriating company property; the company had also accused an African-American employee of the same offense. Shortly thereafter, the two white employees were fired, but the African-American employee was not. Believing their termination to be racially-based, the two white employees filed suit under Title VII of the Civil Rights Act of 1964 and § 1981 alleging unlawful employment discrimination. To resolve the dispute, the Court had to address whether § 1981 encompassed discrimination against white persons. Reasoning that Congress's broad language evinced an intent "to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race," the Court observed:

> Unlikely as it might have appeared in 1866 that white citizens would encounter substantial racial discrimination of the sort proscribed under the Act, the statutory structure and legislative history persuade us that the 39th Congress was intent upon establishing in the federal law a broader principle than would have been necessary simply to meet the particular and immediate plight of the newly freed Negro slaves.

*Id.* at 295-96.

Without clarifying the source of Congress's power to enact a law that prohibited private race discrimination against whites, the Court in *McDonald* declined to restrict § 1981 to claims only by African-Americans. By avoiding the constitutional questions implicated by its broad reading of the statute, the Court left unresolved whether Congress's power to prohibit discrimination against white persons in private employment also emanated from § 1981's Thirteenth Amendment origins or whether it might be based on some other source; particularly, Congress's power under the Commerce Clause. Because the Santa Fe Trail Transportation Company was also

subject to the requirements of Title VII — a statute whose capacity to regulate private conduct has been squarely located in the Commerce Clause, *see* 42 U.S.C. § 2000a; *United Steelworkers of Am. v. Weber*, 443 U.S. 193, 206 n.6 (1979) ("Title VII . . . was enacted pursuant to the commerce power to regulate purely private decisionmaking") — it is questionable whether we can read *McDonald* as recognizing the Thirteenth Amendment as the source of Congress's power to prohibit all private discrimination against whites. Nonetheless, later cases have assumed, without discussion, that Congress does possess the power to prohibit a private school from discriminating against non-African-Americans on the basis of race. *See, e.g., Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609-10 (1987) (permitting suit under § 1981 by professor of Arabian ancestry against a private university); *cf. Gen. Bldg. Contractors*, 458 U.S. at 390 n.17 ("We need not decide whether the Thirteenth Amendment itself . . . accomplished anything more than the abolition of slavery."); *City of Memphis v. Greene*, 451 U.S. 100, 125-26 (1981) (leaving open the question of whether § 1 of the Thirteenth Amendment did anything more than abolish slavery). Whether it stems from a broad reading of section two of the Thirteenth Amendment, or a similarly broad reading of the Commerce Clause, Congress's power to prohibit private race discrimination has not yet been seriously questioned.[3]

---

[3]The parties have not contested the constitutionality of § 1981 as applied to the discriminatory admissions policy in place at the Kamehameha Schools. Although we note the constitutional questions that are implicated, we decline to restrict *McDonald* to its context, in part, because of the alternative constitutional concerns that a "racial minorities only" reading of § 1981 would raise. *See, e.g., Adarand*, 515 U.S. at 227 ("[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny."); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 367 (1978) (Brennan, J., concurring in the judgment in part and dissenting in part) ("To the extent that Congress acted under the Commerce Clause power," when enacting Title VII, "it was restricted in the use of race in governmental decisionmaking by the equal protection component of the Due Pro-

After *Jones*, *Runyon* and *McDonald*, the theoretical coverage of § 1981 appeared almost limitless. In the cases that followed, however, the Court endeavored to define the outer bounds of, as well as the burdens of proof applicable to, § 1981 race discrimination claims. In *General Building Contractors*, the Court emphasized the statute's Fourteenth Amendment origins to hold "that § 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination." 458 U.S. at 391. The Court's decision foreclosed claims premised on disparate impact, claims which are actionable under Title VII. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971).

Seven years later, the Court revisited the relationship between Title VII and § 1981. In *Patterson v. McLean Credit Union*, an African-American former employee of the McLean Credit Union brought a § 1981 suit against her employer, claiming racial harassment, failure to promote, and discharge on account of her race. 491 U.S. 164 (1989), *superseded by statute on other grounds as stated in Estate of Reynolds v. Martin*, 985 F.2d 470, 475 n.2 (9th Cir. 1993). The district court determined that a claim for racial harassment is not actionable under § 1981, and the court of appeals affirmed. The Supreme Court granted certiorari, in part, to decide whether a claim for racial harassment "falls within one of the enumerated rights protected by § 1981." *Id.* at 176.[4] The

cess Clause of the Fifth Amendment"). Accordingly, and until either Congress or the Supreme Court indicates otherwise, we assume for purposes of our remaining analysis that Congress possesses the constitutional authority to prohibit race discrimination both against and in favor of white persons in private schools.

[4]After oral argument, however, the Court requested the parties to brief and argue an additional question: "Whether or not the interpretation of 42 U.S.C. § 1981 adopted by [the] Court in *Runyon v. McCrary*, 427 U.S. 160 (1976), should be reconsidered." *Patterson v. McLean Credit Union*, 485 U.S. 617, 617 (1988) (per curiam). *See also Patterson*, 491 U.S. at 170-171. Concluding that no special justification warranting a departure from the doctrine of *stare decisis* had been shown, the Court declined to overrule *Runyon*. *Id.* at 175 ("We decline to overrule *Runyon* and acknowledge that its holding remains the governing law in this area.").

Court held that it does not; rather, § 1981 is limited by its terms to prohibiting discrimination in the making and enforcing of contracts, and does not extend to "postformation conduct," or problems that may arise later from the terms and conditions of continuing employment. *Id.* at 177-80. Examining the petitioner's failure-to-promote claim, the Court concluded that the district court erred by instructing the jury that the petitioner had to prove that she was better qualified than the white employee who allegedly received the promotion. *Id.* at 186. Drawing from Title VII case law, the Court took this opportunity to clarify the framework for analyzing a § 1981 claim against a private employer:

> We have developed, in analogous areas of civil rights law, a carefully designed framework of proof to determine, in the context of disparate treatment, the ultimate issue whether the defendant intentionally discriminated against the plaintiff. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). We agree with the Court of Appeals that this scheme of proof, structured as a "sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination," *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978), should apply to claims of racial discrimination under § 1981.

*Id.* at 186. Having imported Title VII's *McDonnell Douglas* order of proof, the Court elaborated to explain, in detailed fashion, the specific evidentiary showings required:

> Under our well-established framework, the plaintiff has the initial burden of proving, by a preponderance of the evidence, a prima facie case of discrimination. . . . Once the plaintiff establishes a prima facie case, an inference of discrimination arises. In order to

rebut this inference, the employer must present evidence that the plaintiff was rejected, or the other applicant was chosen, *for a legitimate nondiscriminatory reason. . . .* At this point, as our prior cases make clear, petitioner retains the final burden of persuading the jury of intentional discrimination. Although petitioner retains the ultimate burden of persuasion, our cases make clear that she must also have the opportunity to demonstrate that respondent's proffered reasons for its decision were not its true reasons.

*Id.* at 186-87 (internal quotation marks, citations and footnote omitted) (emphasis added).

**[2]** We find this treatment particularly instructive because the Court's discussion appears to approve the use of, in the arena of § 1981 employment discrimination claims, not only the *McDonnell Douglas* order of proof, but also the nature of the proof that a private defendant in a Title VII action is required to adduce. *See also Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 617 n.1 (1999) (Thomas, J., dissenting) ("This Court has applied the 'framework' developed in Title VII cases to claims brought under [§ 1981].") (citing *Patterson,* 491 U.S. at 186); *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69 (2d Cir. 2000) (analogizing a § 1981 claim to a Title VII claim); *Brown v. Am. Honda Motor Co.,* 939 F.2d 946, 949 (11th Cir. 1991) ("[T]he test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment causes. . . . [T]he defendant must come forward with evidence demonstrating legitimate, nondiscriminatory reasons for its conduct."). While the Court could have suggested that a § 1981 defendant must demonstrate that race-based action is narrowly tailored to further a compelling governmental interest, *see, e.g., Adarand*, 515 U.S. at 227, it stated instead that the employer must show merely "that the plaintiff was rejected, or the other applicant was chosen, for a *legitimate nondis-*

*criminatory reason*," *Patterson*, 491 U.S. at 187 (emphasis added).

The appellant aptly notes that use of the *McDonnell Douglas* burden-shifting *framework* does not necessarily, or even usually, signify that Title VII's substantive standard of scrutiny — in particular, the requirement that the defendant "present evidence that the plaintiff was rejected . . . *for a legitimate nondiscriminatory reason*" — also governs. *Patterson*, 491 U.S. at 187 (emphasis added). The appellant points out that at least one court has made the *McDonnell Douglas* burden-shifting framework available to plaintiffs who must prove intentional discrimination in order to make out a violation of the Equal Protection Clause. *See English v. Colo. Dep't of Corr.*, 248 F.3d 1002, 1007 (10th Cir. 2001) (employing the *McDonnell Douglas* framework to analyze § 1983 claim alleging a violation of the Equal Protection Clause by the Colorado Department of Corrections); *cf. St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 n.1 (1993) (assuming, absent objection from the parties, that it was permissible for the lower court to apply the *McDonnell Douglas* framework to the plaintiff's equal protection claim as well as his Title VII claim); *Fed. Deposit Ins. Corp. v. Henderson*, 940 F.2d 465, 472 & n.14 (9th Cir. 1991) (declining to decide whether *McDonnell Douglas* is the appropriate framework for analyzing an equal protection claim). Nonetheless, the *Patterson* Court specifically found that the district court, while correctly recognizing that the Title VII "scheme of proof should apply in § 1981 cases," erred in "describing the petitioner's burden." *Patterson*, 491 U.S. at 186. We find the Court's complete description of the burden — setting forth both the order of proof and the nature of the proof required — to be the best indication from the Supreme Court as to how lower courts should shape the contours of a § 1981 challenge to a private entity's racially discriminatory practice.

In the Civil Rights Act of 1991, Congress amended the statute specifically to overrule *Patterson*'s holding that § 1981

does not extend to postformation conduct. *See* 42 U.S.C. § 1981(b) (defining the phrase "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship"). The amended statute also clarified any residual doubt as to Congress's intention that § 1981 apply to private discrimination: "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination." 42 U.S.C. § 1981(c). Importantly, nothing in the amended statute calls into question *Patterson*'s discussion of the *McDonnell Douglas* proof structure or the nature of proof required in a § 1981 suit against a private entity.

[3] Although the question has never been squarely presented,[5] we read the Court's decisions both in *Patterson* and in *General Building Contractors* to indicate a willingness to look to the Fourteenth Amendment as a means for restricting liability to the types of racially motivated practices that led Congress to enact § 1981 — namely, intentional discrimination on the basis of race — but to look to Title VII jurisprudence to clarify the order and nature of the proof. *See also City of*

---

[5]Before *Patterson* the decisions of our court frequently assumed, without discussion, that both the nature and the order of proof applicable to Title VII claims also applied to claims brought under § 1981. *See Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1412 (9th Cir. 1987) ("The same standards apply [to claims brought under Title VII and those brought under § 1981], and facts sufficient to give rise to a Title VII claim are also sufficient for a section 1981 claim."); *EEOC v. Inland Marine Indus.*, 729 F.2d 1229, 1233 n.7 (9th Cir. 1984) ("A plaintiff must meet the same standards in proving a § 1981 claim that he must meet in establishing a . . . claim under Title VII[.]"). *See also Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1412 n.7 (D.C. Cir.) (per curiam) ("The standards and order of proof in section 1981 cases have been held to be identical to those governing Title VII disparate treatment cases."), *clarified on reh'g*, 852 F.2d 619 (D.C. Cir. 1988). We have never explicitly considered whether Title VII's requirement that the defendant come forward with a "legitimate nondiscriminatory reason" also applies in the § 1981 context.

*Memphis*, 451 U.S. at 126 (finding § 1982 inapplicable where "the record discloses no racially discriminatory motive" but instead "demonstrates that the interests that did motivate the [defendant] are legitimate").

Contrary to the appellant's argument, we do not find the Court's recent decisions in the "Michigan Affirmative Action Cases" relevant to our analysis. *See Grutter*, 539 U.S. at 343 (concluding that the University of Michigan Law School's admissions program satisfied strict scrutiny under the Equal Protection Clause and, therefore, that it also satisfied Title VI and § 1981); *Gratz*, 539 U.S. at 275-76 n.23 (concluding that the University of Michigan's undergraduate admissions program failed strict scrutiny under the Equal Protection Clause and, therefore, that it also violated Title VI and § 1981). Aside from the fact that both cases involved a challenge to a public university's use of racial preferences in admissions, neither case presented the Court with an occasion to address, at any length, the appropriate standard of scrutiny for a § 1981 challenge. Because the preference in *Grutter* satisfied strict scrutiny, it necessarily would satisfy a lower standard; as the preference in *Gratz* failed strict scrutiny, the invalidity of the university's admissions program rendered it unnecessary for the Court to consider whether it could satisfy a lower standard.[6] The appellant relies, however, on the Court's citation, in *Grutter*, to *General Building Contractors*, which is followed by the parenthetical note, "the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause." *Grutter*, 539 U.S. at 343 (citing *Gen. Bldg. Contractors*, 458 U.S. at 389-91). The Court in *Gratz* similarly dropped a footnote citing *General Building Contractors* for the proposition that "purposeful discrimination that violates

---

[6]We find our recent decision in *Sagana* inapplicable for the same reason that we find the Supreme Court's decision in *Grutter* irrelevant to the facts of this appeal. *See Sagana*, 384 F.3d at 743 (concluding that a challenged governmental employment policy that satisfied Fourteenth Amendment scrutiny necessarily also satisfied scrutiny under § 1981).

the Equal Protection Clause of the Fourteenth Amendment will also violate § 1981." *Gratz*, 539 U.S. at 276 n.23 (citing *Gen. Bldg. Contractors*, 458 U.S. at 389-90). *See also Sagana*, 384 F.3d at 743.

Mindful of the inherent dangers of according undue weight to isolated statements from decisions not directly on point, we read these parenthetical notes simply as recognizing that both the Equal Protection Clause and § 1981 require a showing of intentional discrimination; they are co-extensive on this point. The Court's decision in *Patterson* incorporated this holding, seven years after *General Building Contractors*, when it instructed lower courts to apply the *McDonnell Douglas* framework to claims of racial discrimination in employment brought under § 1981, while noting that the "petitioner retains the final burden of persuading the jury of *intentional* discrimination." *Patterson*, 491 U.S. at 187 (emphasis added). Simply put, the Supreme Court's parenthetical notations in *Grutter* and *Gratz* should be read in light of the specific import of the cited case, and *General Building Contractors* does nothing more than specify that intentional discrimination must be established in order to sustain both an equal protection and a § 1981 challenge. Although, like the Fourteenth Amendment, § 1981 reaches only intentional discrimination, § 1981 is not otherwise co-extensive with the Equal Protection Clause.

From the historical context in which it was passed as well as the cases interpreting its command, we are persuaded that § 1981, like Title VII, "was not intended to incorporate and particularize the commands of the Fifth and Fourteenth Amendments," *Weber*, 443 U.S. at 206 n.6, nor was it intended to apply those commands to private sector discrimination. For this reason, we conclude that § 1981 should not be read *in pari materia* with the Fourteenth Amendment to require the application of strict scrutiny to all private race-based preferences. *See id.* (declining to read Title VII and Title VI *in pari materia*); *Johnson*, 480 U.S. at 630 n.8 (noting Congress's "desire to preserve a relatively large domain

for voluntary employer action"). In sum, having generally abandoned, after *Runyon* and *Jones*, the Fourteenth Amendment as the model for interpreting, and limiting the reach of, §§ 1981 and 1982, we conclude that the substantive standards embodied in modern civil rights laws better capture the jurisprudence of § 1981.

**[4]** Although the instant case involves a § 1981 claim against a private school, we find no reason to depart from the standards outlined in *Patterson* and well-established in the cases interpreting Title VII. While the analysis necessarily must be modified in order to account for differences of context, the substantive guarantee should remain the same: the right to make and enforce contracts free from illegitimate and unlawful discrimination on the basis of race. Accordingly, we hold that a § 1981 suit against a purely private school is governed by the substantive standards applicable to race-based challenges brought pursuant to Title VII of the Civil Rights Act of 1964. This means that once the § 1981 plaintiff establishes a prima facie case of intentional race discrimination, the defendant must come forward with a legitimate nondiscriminatory reason justifying the challenged practice; if such a reason is offered the plaintiff may still attempt to show that the reason is a pretext for unlawful race discrimination.

It remains to clarify how these standards should operate in the context of private education.

B

Under the proof structure and accompanying substantive standards that we now import, the complainant in a § 1981 suit against a purely private school must carry the initial burden of establishing a prima facie case of racial discrimination. *See McDonnell Douglas*, 411 U.S. at 802.[7] Where an explicit

---

[7]As is true with respect to the application of the *McDonnell Douglas* proof structure in the context of Title VII employment discrimination

race-based admissions policy exists, proof of this fact alone is sufficient to establish a prima facie case.

If the plaintiff proves his prima facie case, a rebuttable presumption of intentional discrimination arises, *see Tex. Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981), and the burden of production shifts to the school to articulate a legitimate nondiscriminatory reason for its admissions policy. *See McDonnell Douglas*, 411 U.S. at 802. *See also Burdine*, 450 U.S. at 255-56. If the school satisfies this burden, the burden of production again shifts to the plaintiff to prove that the school's articulated reason is a pretext for unlawful race discrimination. *See Hicks*, 509 U.S. at 515-16; *McDonnell Douglas*, 411 U.S. at 804. Despite the shifting burdens, the ultimate burden of persuasion that the school intentionally discriminated on the basis of race remains with the plaintiff at all times. *Hicks*, 509 U.S. at 507.

We turn, next, to the task of applying these standards to the plaintiff-appellant's § 1981 challenge to the racially exclusionary admissions policy in place at the Kamehameha Schools.

## IV

It is undisputed that the Kamehameha Schools employs an express racial classification designed to deny admission to all students possessing no aboriginal blood, so long as qualified native Hawaiian applicants seek admission in sufficient number to fill the positions.[8] Accordingly, the issue becomes

claims, the elements of a prima facie case will vary depending on the particular facts involved. *See McDonald*, 427 U.S. at 279 n.6 (" 'specification . . . of the prima facie proof required . . . is not necessarily applicable in every respect to differing factual situations' ") (quoting *McDonnell Douglas*, 411 U.S. at 802 n.13).

[8]Appellees argue that the racial preference is not an absolute bar to the admission of non-Hawaiians because if spaces exceed the number of qual-

whether the Schools can articulate a legitimate nondiscriminatory reason justifying this racial preference. Toward this end, the Schools urge that its policy constitutes a valid affirmative action plan rationally related to redressing present imbalances in the socioeconomic and educational achievement of native Hawaiians, producing native Hawaiian leadership for community involvement, and revitalizing native Hawaiian culture.

[5] The Supreme Court has held that Title VII's prohibition against racial discrimination "does not condemn all private, voluntary, race-conscious affirmative action plans." *Weber*, 443 U.S. at 208. Consequently, in the Title VII context, if the challenged employment decision was made pursuant to such a plan, the existence of an affirmative action plan itself can form the basis of a legitimate nondiscriminatory rationale. *See Johnson*, 480 U.S. at 626. We assume, absent objection from the parties, that the same principle applies to a § 1981 suit against a purely private school. *See, e.g., Edmonson v. United States Steel Corp.*, 659 F.2d 582, 584 (5th Cir. 1981) (per curiam) (applying Title VII standards in the context of § 1981 employment discrimination challenge to race-conscious affirmative action plan); *accord Setser v. Novack Inv. Co.*, 657 F.2d 962, 966-68 (8th Cir. 1981) (en banc), *cert. denied*, 454 U.S. 1064 (1981); *cf. McDonald*, 427 U.S. at 280 n.8 (declining to consider the permissibility, under § 1981, of an affirmative action program).

[6] As a preliminary matter, we note that the plaintiff generally bears the burden of establishing the invalidity of an

---

ified native Hawaiian applicants, Kamehameha will admit non-Hawaiian students. They point out that, in 2003, a non-Hawaiian student was admitted to the Kamehameha Schools; a fact which, the record suggests, owed more to accident than design as it prompted an immediate full-scale investigation and promise, on the part of School administrators, to ensure that admission remained for native Hawaiians only. Whether or not the policy is, in the abstract, an absolute bar to admission for those of the non-preferred race, it certainly operates as one.

affirmative action plan challenged under Title VII. *See John-son*, 480 U.S. at 626 ("If [an affirmative action] plan is articulated as the basis for the [challenged employment] decision, the burden shifts to the plaintiff to prove that the employer's justification is pretextual and the plan is invalid."); *cf. Hill v. Ross*, 183 F.3d 586, 590 (7th Cir. 1999) (noting that *Johnson*'s discussion of burdens was undermined by subsequent decisions, but declining to decide whether it survived those decisions); *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1115 (11th Cir. 2001) (same). We see no basis for a different rule regarding a plan's alleged violation of § 1981 in the context of private education. Our remaining analysis, therefore, will focus on determining whether the plaintiff-appellant has met this burden.

A

The starting point for our analysis is the Court's seminal decision in *United Steelworkers of America v. Weber*, 443 U.S. 193 (1979). At issue in *Weber* was an affirmative action plan collectively bargained by a union and an employer that reserved for African-American employees fifty percent of the openings in an in-plant craft training program. In ruling that the challenged plan fell on the permissible side of the line demarcating valid affirmative action plans from those which violate the commands of Title VII, the Court observed that the purpose of the plan mirrored that of Title VII: to "break down old patterns of racial segregation and hierarchy" and to " 'open employment opportunities for [minorities] in occupations which have been traditionally closed to them.' " *Id*. at 208 (citing and quoting 110 CONG. REC. 6548 (1964) (remarks of Sen. Humphrey)). It emphasized that the plan did so without "unnecessarily trammel[ing] the interests of the white employees"; specifically, the plan did not "require the discharge of white workers and their replacement with new black hirees," and did not "create an absolute bar to the advancement of white employees." *Id*. Finally, the Court noted that "the plan is a temporary measure; it is not intended to main-

tain racial balance, but simply to eliminate a manifest racial imbalance." *Id.*[9]

While "[t]he *Weber* Court did not establish a rigid formula for testing the validity of an affirmative action plan," *Johnson v. Transp. Agency*, 770 F.2d 752, 757 (9th Cir. 1984); *see also Setser*, 657 F.2d at 969-70, later cases have used *Weber* as a general guide for assessing the legality of affirmative action plans challenged pursuant to Title VII. *See, e.g., Johnson*, 480 U.S. at 627 ("The assessment of the legality of the [affirmative action plan in question] must be guided by our decision in *Weber*."); *Local 28 of Sheet Metal Workers Int'l Ass'n v. EEOC*, 478 U.S. 421, 479 (1986) (applying *Weber* and finding that a court-imposed union membership goal and fund established to increase minority enrollment, which did not "require any member of the union to be laid off," "discriminate against existing union members," nor bar admission of white applicants to the union, did not "unnecessarily trammel[ ] the interests of white employees"). We are persuaded that these general principles may be rationally applied in the context of private education, with certain modifications to account for the differences of context.

[7] We recently distilled the Court's analysis in *Weber* into three distinct requirements: affirmative action plans must (1) respond to a manifest imbalance in its work force; (2) not " 'create[ ] an absolute bar to the[ ] advancement' " of the non-preferred race or " 'unnecessarily trammel[ ]' " their rights; and (3) do no more than is necessary to achieve a balance. *Rudebusch v. Hughes*, 313 F.3d 506, 520-21 (9th Cir. 2002) (quoting *Johnson*, 480 U.S. at 637-38). The appellant claims that the Schools' program fails under the first of these criteria: rather than addressing a manifest internal imbalance,

---

[9]Under the plan, the preference was slated to end as soon as the percentage of minority skilled craftworkers approximated the percentage of minorities in the local labor force. *Weber*, 443 U.S. at 208-09.

it seeks to address an imbalance external to its student population.

**[8]** We do not address the appellant's claims because we find the second of *Weber*'s guiding principles fatal to the program in place at the Kamehameha Schools. The school's admission policy operates as an absolute bar to admission for non-Hawaiians. Kamehameha's unconditional refusal to admit non-Hawaiians so long as there are native Hawaiian applicants categorically "trammels" the rights of non-Hawaiians. The Court in *Runyon* made clear that an admissions policy that consciously and conspicuously denies admission to all members of the non-preferred race on account of their race is "a classic violation of § 1981." 427 U.S. at 172.

Appellees argue, nonetheless, that the need is so great that the Schools should be permitted to admit only native Hawaiians until the educational deficits affecting that community disappear. They present abundant evidence demonstrating that native Hawaiians are over-represented in negative socioeconomic statistics such as poverty, homelessness, child abuse and neglect, and criminal activity; they are more likely to live in economically disadvantaged neighborhoods and attend low-quality schools; and, because of low levels of educational attainment, they are severely under-represented in professional and managerial positions, and over-represented in low-paying service and labor occupations. In sum, they urge, even though the admissions policy creates an "absolute bar," it is *necessary* for the Schools to "trammel" the interests of non-aboriginal applicants in order to reach its goal.

**[9]** To accept this argument, however, is to completely abolish what we perceive to be an important limitation embodied in *Weber*'s second principle: fairness to applicants of the non-preferred race. Even if we assumed that some, limited racial preferences might be appropriate in order for the Schools to advance its mission, an absolute bar on the basis of race alone exceeds any reasonable application of *Weber*,

*Rudebusch*, and the cases that followed in their wake. "Classi-fications of [persons] solely on the basis of race . . . threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." *Shaw v. Reno*, 509 U.S. 630, 643 (1993). Indeed, the sub-text to the Schools' pol-icy — that of all those who are found in poverty, homeless-ness, crime and other socially or economically disadvantaged circumstances, only native Hawaiians count — "perpetuate[s] the notion that race matters most" and " 'may exacerbate the very [conditions that Kamehameha's policy is intended] to counteract.' " *Johnson v. California*, 125 S. Ct. 1141, 1143 (2005) (quoting *Shaw*, 509 U.S. at 648). As we emphasized in *Coral Construction Co. v. King County*, "race conscious programs must be designed to minimize — if not avoid — burdens upon nonculpable third parties." 941 F.2d 910, 917 (9th Cir. 1991). We cannot agree with the district court's con-clusion that the challenged program constitutes a valid affir-mative action plan supplying a legitimate nondiscriminatory reason for the Schools' racially exclusionary admissions pol-icy. Under the principles we find controlling, the Schools' absolute bar to admission on the basis of race is invalid.

B

Appellees urge that Congress's intent is essential to guiding our interpretation of how § 1981 applies to a particular set of facts. They argue that because Congress has given native Hawaiians in general, and the Kamehameha Schools in partic-ular, preferences in the context of education, *see* 20 U.S.C. § 7901 *et seq.*; 20 U.S.C. § 7511 *et seq.*, our analysis must harmonize these enactments by according the Schools greater deference under § 1981. Appellees argue that it is inconceiv-able that the same Congress that enacted preferences for native Hawaiians would think that the Schools preferences violate § 1981; additionally, they argue that we can give § 1981 this more generous reading because § 1981 was amended in the Civil Rights Act of 1991.

We have located no authority for the proposition that congressional intent, as manifested by scattered statutes adopted specially for the benefit of native Hawaiians, is sufficient to modify the standards embodied in a statute of general applicability. We cannot imagine the task of trying to harmonize all of the various acts of Congress — a prodigious output that is ever expanding and contracting — with statutes of general applicability such as § 1981.[10] Congress is quite capable of creating exceptions for such laws, and we would intrude on its ability or willingness to do so if we scoured the U.S. Code for hints of contrary intent. For reasons both of separation of powers and our own sanity, we will not undertake such a task. Rather, our role, in the context of § 1981, "is limited to interpreting what Congress may do and has done." *Patterson*, 491 U.S. at 188.

Judge GRABER, in dissent, urges us to consider 20 U.S.C. § 4905(a) (1991) (repealed 1994) as evidence of Congress's intent to abrogate the otherwise plain language of § 1981 as it applies to the Kamehameha Schools' racially exclusionary admissions policy. We are told that because the now repealed § 4905(a) authorized grants to the Kamehameha Schools to develop a demonstration program to support native Hawaiians who choose to attend college, it follows as an "inescapable conclusion" that Congress intends the Schools to refuse to admit, into its K-12 program, anyone without aboriginal blood. Dissent, at 8966. Even assuming, *arguendo*, the premise that § 1981 may affect parties differently when Congress so directs, we cannot agree that a statute adopted in 1988 and repealed in 1994 created a native Hawaiian carve-out for § 1981.[11]

---

[10]This is particularly true when we deal with a statute of such venerable provenance as § 1981, one that long pre-dates Congress's more recent native Hawaiian preferences.

[11]Reading § 4905(a) to authorize exclusive racial preferences for native Hawaiians in education may raise constitutional problems in light of the Supreme Court's decision in *Rice*. See *Rice*, 528 U.S. at 518 (declining to

Over the years, Congress has directed research, support and assistance at numerous minority groups, as well as the category of "minorities" in general. *See*, *e.g.*, Minority Access to Research Careers Program, 42 U.S.C. §§ 241, 285k, 288, 288a (1988); Patricia Roberts Harris Fellowship Program, Pub.L. 99-498, Title IX, § 901(a), Oct. 17, 1986, 100 Stat. 1550 (repealed Pub.L. 105-244, Title VII, § 702, Oct. 7, 1998, 112 Stat. 1803); Excellence in Mathematics, Science and Engineering Act of 1990, Pub. L. No. 101-589, 104 Stat. 2881 (1990); African-American History Landmark Theme Study, Pub.L. 102-98, Aug. 17, 1991, 105 Stat. 485 (1991). But it would be overreaching to interpret these statutes as blanket approval for private race discrimination that is otherwise violative of § 1981. So far as we are aware, Congress has never even considered the racial bar to admission in place at the Kamehameha Schools, and we cannot infer implicit approval from a statute that merely authorized financial support for college-bound native Hawaiians. Thus, while we agree with the dissent that we should read statutes capable of co-existence "to give effect to each," we find no conflict between § 4905(a), which authorizes federal financial assistance to promote native Hawaiian higher education, and § 1981, which forbids a private institution from erecting an absolute bar to admission or advancement solely on the basis of race. *Watt v. Alaska*, 451 U.S. 259, 267 (1981).

Importantly, we find little to suggest that Congress, in enacting the Civil Rights Act of 1991, intended to do anything

uphold a race-based voting restriction for native Hawaiians absent "some beginning premises not yet established in [the Court's] case law[;]" namely, that Congress "has determined that native Hawaiians have a status like that of Indians in organized tribes"). If Congress's classifications based on native Hawaiian status are, indeed, of a racial nature, they may fall subject to strict scrutiny under the equal protection component of the Fifth Amendment. *See Adarand*, 515 U.S. at 227 ("[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny.").

more than overrule the holding in *Patterson*, 491 U.S. at 177-80, and codify the holding in *Runyon*, 427 U.S. at 170-71. *See, e.g.*, H.R. REP. NO. 102-40, 102d CONG., 1st SESS., pt.II, at 37 (1991) ("[Subsection (b)] overrules *Patterson* by adding a new subsection to Section 1981. . . . [Subsection (c)] is intended to codify *Runyon v. McCrary*."). To divine, from scattered statutes enacted years apart, that Congress has manifested an obvious intent to alter the application of § 1981 to exclusionary racial preferences granted on behalf of native Hawaiians — or, indeed, that Congress has considered the interrelationship of these statutes at all — grants considerably more weight to congressional silence than we find appropriate in this context.

**[10]** Absent proof that Congress has validly *exempted* the Schools — or the class of native Hawaiians as a whole — from the substantive commands of § 1981, we can ascertain no basis for subjecting a private school's racial preference premised on aboriginal blood to a wholly different standard than all other racial preferences challenged under the statute. We thus turn to the question of whether Congress has implicitly exempted the Schools from § 1981.

## C

**[11]** Appellees' argument — that a preference for native Hawaiians should be analyzed under a relaxed level of scrutiny in light of the unique trust relationship between the federal government and the native Hawaiian people — is, essentially, a generalized appeal to the "special relationship doctrine" typically advanced to support preferences accorded members of federally recognized Indian tribes. Using this doctrine, the Supreme Court has, on numerous occasions, specifically upheld legislation granting preferential treatment to Native Americans. *See, e.g., Mancari*, 417 U.S. at 550 (collecting cases).

The seminal case recognizing the doctrine, upon which all subsequent cases rely, is the Supreme Court's 1974 decision

in *Morton v. Mancari*, 417 U.S. at 553. In *Mancari*, the Court observed that the preference in question — a Bureau of Indian Affairs hiring preference for Native Americans — was "not directed towards a 'racial' group consisting of 'Indians'," but instead applied "only to members of 'federally recognized' tribes." *Id.* at 553 & n.24. *See also* id. at 554 ("The preference, as applied, is granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities whose lives and activities are governed by the BIA in a unique fashion."). In this sense, the Court determined, "the preference is *political* rather than racial in nature" and, accordingly, should be reviewed merely to determine whether it is reasonably and rationally designed to further Indian self-government. *Id.* at 553 n.24 (emphasis added). Concluding that it was, the Court upheld the validity of the hiring preference against a Title VII challenge. *Id.* at 554 ("Here, the preference is reasonably and directly related to a legitimate, nonracially based goal. This is the principal characteristic that generally is absent from proscribed forms of racial discrimination."). Later cases have applied *Mancari*'s analysis without modifying the distinction between classifications based on political affiliation and those based on race. *See, e.g., Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 500-01 (1979) ("It is settled that the unique legal status of Indian tribes under federal law permits the Federal Government to enact legislation singling out tribal Indians, legislation that might otherwise be constitutionally offensive." (internal quotation marks omitted)); *United States v. Antelope*, 430 U.S. 641, 645 (1977) ("The decisions of this Court leave no doubt that federal legislation with respect to Indian tribes, although relating to Indians as such, is not based upon impermissible racial classifications. Quite the contrary, classifications expressly singling out Indian tribes as subjects of legislation are expressly provided for in the Constitution and supported by the ensuing history of the Federal Government's relations with Indians." (footnote omitted)); *Fisher v. Dist. Court*, 424 U.S. 382, 390 (1976) (per curiam) ("[W]e

reject the argument that denying [the Indian plaintiffs] access to the Montana courts constitutes impermissible racial discrimination. The exclusive jurisdiction of the Tribal Court does not derive from the race of the plaintiff but rather from the quasi-sovereign status of the Northern Cheyenne Tribe under federal law.").

[12] As it has for Native Americans, Congress has enacted numerous statutes providing separate benefit programs for native Hawaiians or including them in benefit programs that assist other native people. *See*, *e.g.*, Hawaiian Homes Commission Act § 1 *et seq.*, 42 Stat. 108 (1920) (setting aside 200,000 acres and establishing a program of loans and long-term leases for the benefit of Native Hawaiians); Department of Defense Appropriations Act, Pub. L. No. 103-335, 108 Stat. 2599, 2652 (1994) ("In entering into contracts with private entities to carry out environmental restoration and remediation of Kahoʻolawe Island . . . the Secretary of the Navy shall . . . give especial preference to businesses owned by Native Hawaiians"); Native Hawaiian Education Act, 20 U.S.C. § 7512(13) *et seq.* (establishing programs to facilitate the education of Native Hawaiians and asserting a "political relationship between the United States and the Native Hawaiian people"); Native American Graves Protection and Repatriation Act, 25 U.S.C. § 3001 *et seq.* (extending protection to American Indian and Native Hawaiian burial sites); Native Hawaiian Health Care Improvement Act of 1992, 42 U.S.C. § 11701(17) *et seq.* (creating a number of programs aimed at improving health care for Native Hawaiians and stating, "The authority of the Congress under the United States Constitution to legislate in matters affecting the aboriginal or indigenous peoples of the United States includes the authority to legislate in matters affecting the native peoples of Alaska and Hawaii"); Hawaiian Homelands Homeownership Act of 2000, Pub. L. No. 106-569, §§ 511-514, 114 Stat. 2944, 2966-67, 2990 (providing governmental loan guarantees "to Native Hawaiian families who otherwise could not acquire housing financing"); National Historic Preservation Act, 16 U.S.C.

§ 470-1(2) (to "provide leadership in the preservation of the prehistoric and historic resources of the United States and of the international community of nations and in the administration of the national preservation program in partnership with States, Indian tribes, Native Hawaiians, and local governments"); National Museum of the American Indian Act, 20 U.S.C. § 80q(8) (providing for the return of Native Hawaiian human remains and funerary objects as well as the creation of a museum exclusively for the preservation and study of the history and artifacts of Native Americans); Drug Abuse Prevention, Treatment and Rehabilitation Act, 21 U.S.C. § 1177(d) (involving grant applications aimed at combating drug abuse and providing: "The Secretary shall encourage the submission of and give special consideration to applications under this section to programs and projects aimed at underserved populations such as racial and ethnic minorities, Native Americans (including Native Hawaiians and Native American Pacific Islanders), youth, the elderly, women, handicapped individuals, and families of drug abusers."); Native American Languages Act, 25 U.S.C. §§ 2901-06 (including Native Hawaiian languages in the ambit of Native American languages accorded statutory protection); Workforce Investment Act of 1998, 29 U.S.C. § 2911(a) ("The purpose of this section is to support employment and training activities for Indian, Alaska Native, and Native Hawaiian individuals"); American Indian Religious Freedom Act, 42 U.S.C. § 1996 ("it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites."); Native American Programs Act of 1974, 42 U.S.C. §§ 2991-92, 2991a (including Native Hawaiians in a variety of Native American financial and cultural benefit programs: "The purpose of this subchapter is to promote the goal of economic and social self-sufficiency for

American Indians, Native Hawaiians, other Native American Pacific Islanders (including American Samoan Natives), and Alaska Natives."); Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment, and Rehabilitation Act, 42 U.S.C. § 4577(c)(4) (giving preference to grant applications aimed at combating drug abuse: "The Secretary shall encourage the submission of and give special consideration to applications under this section for programs and projects aimed at underserved populations such as racial and ethnic minorities, Native Americans (including Native Hawaiians and Native American Pacific Islanders), youth, the elderly, women, handicapped individuals, public inebriates, and families of alcoholics."); 20 U.S.C. § 4441 (providing funding for Native Hawaiian arts and cultural development); Older Americans Act of 1965, 42 U.S.C. § 3001 *et seq.*, 45 C.F.R. § 1328.1 (2004) (establishing a "program . . . to meet the unique needs and circumstances of Older Hawaiian Natives"). Insofar as these statutes have articulated a constitutional basis, they have usually asserted that the programs are enacted pursuant to a special relationship between the federal government and native Hawaiians akin to that with Native Americans. *See, e.g.*, 20 U.S.C. § 7512(13) (containing findings); 42 U.S.C. § 11701(17) (same); 20 U.S.C. § 4901 (1991) (repealed 1994) (same).

In addition, Congress has expressly, and repeatedly, determined that the United States wrongfully participated in the demise of the Hawaiian Monarchy, *see, e.g.*, Native Hawaiian Education Act, 20 U.S.C. § 7512 (findings); Native Hawaiian Health Care Improvement Act, 42 U.S.C. § 11701 (findings); Apology Resolution, S. Joint Res. No. 19, Pub. L. No. 103-150, 107 Stat. 1510 (1993), the harmful consequences of which, in terms of the decimation and suffering wrought on the native Hawaiian people and culture, are well documented. *See, e.g., Kamehameha Sch.*, 295 F. Supp. 2d at 1150-55. *See also* FUCHS, HAWAII PONO: AN ETHNIC AND POLITICAL HISTORY (1961); R. KUYKENDALL, THE HAWAIIAN KINGDOM (1967). Accordingly, Congress has asserted that the United States has

a political relationship with, and a special trust obligation to, native Hawaiians as the indigenous people of Hawaii. *See, e.g.,* 20 U.S.C. § 7512; 42 U.S.C. § 11701.

We find it of some significance, however, that, in legislating for native Hawaiians, Congress has not consistently treated them in the same manner as Native Americans. Rather, Congress has, on occasion, opted to exclude native Hawaiians from beneficial programs created for Native Americans. *See Kahawaiolaa v. Norton*, 386 F.3d 1271, 1282 (9th Cir. 2004) (observing that "Congress has specifically included . . . native Hawaiians . . . in certain privilege-granting statutes while specifically excluding [them] . . . from a number of others"; collecting statutes). Nonetheless, Appellees appeal to those statutes enacted for the benefit of native Hawaiians to support their argument that the Kamehameha Schools' racial preference should be analyzed under a deferential form of scrutiny that recognizes Congress's special trust relationship and maintains consistency among its legislative enactments. We find this argument foreclosed by Appellees' explicit concession that the preference at issue constitutes discrimination on the basis of race.

Even assuming that Congress may validly exempt native Hawaiians from the substantive commands of § 1981,[12] a private school's admissions preference cannot be exclusively racial, yet simultaneously subject to the special relationship doctrine. The Court's decision in *Mancari*, 417 U.S. at 553 n.24, took pains to emphasize the nonracial nature of the challenged hiring preference, expressly ruling that the precise classification at issue, which was based on Indian tribal affili-

---

[12]*Cf. Rice*, 528 U.S. at 518. *See also* Stuart Minor Benjamin, *Equal Protection and the Special Relationship: The Case of Native Hawaiians*, 106 YALE L.J. 537, 539-40 (1996) (arguing that "without a Native Hawaiian political entity that can constitute an 'Indian Tribe[ ]' for constitutional purposes, there is no 'special relationship' between Native Hawaiians and the federal government pursuant to which programs singling out Native Hawaiians would be subject to rational basis review").

ation, was not racial, but, rather, *political* in nature; for this reason, it was subject only to rational basis review.[13] The same principle does not apply to the classification employed by the Kamehameha Schools, which Appellees concede to be exclusively racial in nature, design and purpose. Thus, because we conclude that Appellees have waived the issue, we find it unnecessary to address whether Congress has validly exempted native Hawaiians from § 1981's substantive mandate.

Judge GRABER would find that the United States government enjoys a trust relationship "that parallels (but is not identical to) that between the federal government and Native Americans." Dissent, at 8967. Only five years ago, in the context of a challenge brought under the Fifteenth Amendment, the Supreme Court declined an invitation to hold as much, concluding that to do so "would [ ] require[ ] accept[ing] some beginning premises not yet established in [the Court's] case law." *Rice*, 528 U.S. at 518. Importantly, the Court was unwilling to hold that Congress "has determined that native Hawaiians have a status like that of Indians in organized tribes." *Id*. We are unaware of any single case or statute that has intervened to establish these "beginning premises;" indeed, the only statute the dissent relies on at any length — 20 U.S.C. § 4905(a) — had been enacted and repealed long before the Court's decision in *Rice*. In sum, it remains unclear whether the United States government enjoys a trust relationship with native Hawaiians similar to that enjoyed with organized tribes. But under the statutes and case law as they exist now, we, like the Court in *Rice*, find it advisable to "stay far off that difficult terrain." *Rice*, 528 U.S. at 519.

[13] We acknowledge that the status of native Hawaiians and their relationship, as a class, to the federal government

---

[13]Moreover, the Court, in *Mancari*, was careful to note that its decision was confined to the authority of the Bureau of Indian Affairs, 417 U.S. at 554, a limitation later emphasized by the Court in *Rice*, 528 U.S. at 520.

presents difficult questions of serious import, complicated both by history and by politics, and carrying tremendously far-reaching consequences. *See Rice*, 528 U.S. at 501 ("The status of Hawaiian lands has presented issues of complexity and controversy from at least the rule of Kamehameha I to the present day."). *See also* Jon M. Van Dyke, *The Political Status of the Native Hawaiian People*, 17 YALE L. & POL'Y REV. 95 (1998); Stuart Minor Benjamin, *Equal Protection and the Special Relationship: The Case of Native Hawaiians*, 106 YALE L.J. 537 (1996). Nonetheless, it does not follow from *Mancari*, or from any other authority of which we are aware, that Congress may authorize a private school to exclusively restrict admission on the basis of an express *racial* classification. Rather, the Court's decisions in this arena have emphasized the nonracial nature of classifications held to withstand scrutiny under modern civil rights laws. Because Appellees do not argue that the classification in question should be viewed as anything but expressly racial, we refrain from addressing the matter further. *See Rice*, 528 U.S. at 519.

V

**[14]** We emphasize that our ruling today is a narrow one. We conclude only that the plaintiff-appellant has met his burden of establishing the invalidity of the racially exclusionary affirmative action plan in place at the Kamehameha Schools, as that plan currently operates as an absolute bar to admission for those of the non-preferred race. Nothing in our decision, however, implicates the validity of the Pauahi Bishop Will, as we do not read that document to require the use of race as an admissions prerequisite. Consequently, we affirm the entry of summary judgment for the Bernice Pauahi Bishop Estate and its individual trustees.

**[15]** For the foregoing reasons, the decision of the district court granting summary judgment to the Kamehameha Schools is reversed. In all other respects, the judgment is

affirmed. The case is remanded for proceedings consistent with this opinion.

## AFFIRMED IN PART; REVERSED IN PART.

---

GRABER, Circuit Judge, concurring in part and dissenting in part:

I respectfully dissent from the majority's conclusion that 42 U.S.C. § 1981 bars the admissions policy of the Kamehameha Schools. Our only task is to discern Congress' intent with respect to the application of § 1981 to a wholly private, Hawaiian institution that educates Native Hawaiian children in Hawaii. Although I have no quarrel with many of the general principles set forth so gracefully in the majority opinion —and, indeed, I concur in the opinion insofar as it applies Title VII principles, rather than strict scrutiny, to admissions preferences by a private school—I cannot agree with the opinion's narrow perspective on congressional intent.

When Congress first enacted § 1981 in 1866, the Hawaiian Islands were still a sovereign kingdom. But in 1991, when Congress revisited and reenacted § 1981 in the Civil Rights Act of 1991, Pub. L. No. 102-166, § 101, 105 Stat. 1071, Congress' view of the statute's proper scope presumptively was informed by the body of law that had developed in the interim. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation."); 1A Norman J. Singer, *Sutherland Statutory Construction* § 23.10, at 487 (6th ed. 2002) (describing the doctrine that "the legislature is presumed to envision the whole body of the law when it enacts new legislation"). It is our duty to harmonize § 1981, to the extent possible, with the statutory context in which Congress acted. *See Watt v. Alaska*, 451 U.S. 259, 267 (1981) ("We must read [apparently conflicting] statutes to give effect to each if we

can do so while preserving their sense and purpose."); *Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").

In 1988, just three years before its reenactment of § 1981, Congress recognized the United States government's unique relationship with Native Hawaiians, acknowledged the severe socioeconomic and educational disadvantages experienced by Native Hawaiians, and authorized federal money for private entities—including the Kamehameha Schools—to provide loans and scholarships exclusively to Native Hawaiians. For example, Congress found, in the Native Hawaiian Health Care Act of 1988, Pub. L. No. 100-579, § 2(2) 102 Stat. 2916, that the federal government's contributions to improving the health of Native Hawaiians "are consistent with the historical and unique legal relationship of the United States with the government that represented the indigenous native people of Hawaii."

Congress spoke particularly, and at length, to the educational needs of Native Hawaiians in the Augustus F. Hawkins-Robert T. Stafford Elementary and Secondary School Improvement Amendments of 1988 ("Hawkins-Stafford Amendments"), Pub. L. No. 100-297, tit. IV, § 4001 ("Education for Native Hawaiians"), 102 Stat. 130:

The Congress finds and declares that —

(1) the Federal Government retains the legal responsibility to enforce the administration of the State of Hawaii's public trust responsibility for the betterment of the conditions of Native Hawaiians;

(2) in furtherance of the responsibility for the betterment of the conditions of Native Hawaiians, Con-

gress has the power to specially legislate for the benefit of Native Hawaiians;

   (3) the attainment of educational success is critical to the betterment of the conditions of Native Hawaiians;

   (4) it is the policy of the Federal Government to encourage the maximum participation of Native Hawaiians in the planning and management of Native Hawaiian Education Programs;

   . . . .

   (9) special efforts in education recognizing the unique cultural and historical circumstances of Native Hawaiians are required.

20 U.S.C. § 4901 (1991) (repealed 1994).[1]

Having made those findings, Congress specifically directed the Secretary of Education to "make grants to the Kamehameha Schools/Bernice Pauahi Bishop Estate" — that is, *to the Defendants in this case* — "for a demonstration program to provide Higher Education fellowship assistance *to Native Hawaiian students*." 20 U.S.C. § 4905(a) (1991) (repealed 1994) (emphasis added).[2] The sole beneficiaries of this federal

---

[1]Even though the quoted sections were repealed in 1994, they signal Congress' sustained intent. First, the statutes were in effect in 1991 when Congress re-enacted § 1981. Second, Congress has continued throughout the years to make similar findings about the unique educational needs of Native Hawaiian children and the unique relationship between the United States government and the Native Hawaiian people. *See, e.g.*, 20 U.S.C. § 7512. Congress also has continued to authorize funds for educational programs serving Native Hawaiian children. *See, e.g.*, *id.* § 7515.

[2]In 1987, a year before the enactment of the Hawkins-Stafford Amendments, Congress had provided funds for a "Native Hawaiian organization" to "make loans to Native Hawaiian organizations and to *individual Native Hawaiians* for the purpose of promoting economic development in the State of Hawaii." Native American Programs Act Amendments of 1987, Pub. L. No. 100-175, tit. V, § 506(a), 101 Stat. 926 (emphasis added).

fellowship assistance were to be "Native Hawaiian," a term that was defined in the statute—as it is in the Kamehameha Schools' admission policy—to mean "a descendant of the aboriginal people, who prior to 1778, occupied and exercised sovereignty in the area that now comprises the State of Hawaii." 20 U.S.C. § 4909(1)(C) (1991) (repealed 1994). *Compare id. with Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate*, 295 F. Supp. 2d 1141, 1156-57 (D. Haw. 2003) (describing the Schools' admissions policy).

That exclusive educational preference for Native Hawaiians, which was motivated by the need to remedy abysmal socioeconomic and educational conditions and by the United States government's unique relationship with and responsibility for Native Hawaiians, was part of the statutory context into which § 1981 was reenacted. Having just adopted this private, remedial, exclusive preference for Native Hawaiians, Congress could not have intended for § 1981 to bar, categorically, every private program that provides an exclusive preference to Native Hawaiians. And, for that reason, I disagree that the mere fact that Kamehameha Schools grants an exclusive preference to Native Hawaiian applicants is dispositive of this case. Indeed, the inescapable conclusion from the statutory context is that in 1991 Congress intended that a preference for Native Hawaiians, in Hawaii, by a Native Hawaiian organization, located on the Hawaiian monarchy's ancestral lands, be upheld because it furthers the urgent need for better education of Native Hawaiians, which Congress had identified explicitly in 1988.

The majority holds that § 1981 forbids all exclusive racial preferences (whether remedial or not) and suggests that political status is the only alternative justification for the Schools' exclusive preference for Native Hawaiians. *See* maj. op. at 8951-52. Thus, the Schools' concession that "Native Hawaiian" is a racial category, for purposes of this case, dooms its policy under the majority's view. *See* maj. op. at 8957-60. I do not perceive such a dichotomy between the racial and the

political aspects of the Schools' preference for Native Hawaiian applicants. That is, if "Native Hawaiian" is indeed a racial category, then Congress has shown by its actions that an exclusive, remedial, racial preference *can* be permissible, at least when it is employed to remedy demonstrable and extreme educational and socioeconomic deficiencies that are faced by a racial group that (a) is descended from people whose sovereignty and culture were upended and nearly destroyed, in part by the actions of the United States, and (b) consequently enjoys a special trust relationship with the United States government that parallels (but is not identical to) that between the federal government and Native Americans. These factors distinguish Native Hawaiians from the other racial groups mentioned by the majority, *see* maj. op. at 8953-54, who have received special funding. In other words, we need not decide that Native Hawaiians have any particular political status in order to recognize, as Congress has, that the Kamehameha Schools pursue unique remedial objectives and may, consistent with congressional intent, employ special remedial tools.

The Supreme Court has not established "a rigid formula for testing the validity of an affirmative action plan" applied by a private employer, *Johnson v. Transp. Agency*, 770 F.2d 752, 757 (9th Cir. 1985), nor has it spoken at all to the operation of § 1981 with respect to remedial preferences at a private school. In the absence of more specific Supreme Court guidance, we should look directly to congressional intent. Congress clearly meant to allow for the private education of Native Hawaiian children at the Kamehameha Schools. Because the statutory context demonstrates that Congress did not intend for § 1981 to bar all exclusive preferences to remedy the severe educational deficits suffered by Native Hawaiians, a population unique within this country, and because Kamehameha Schools has amply demonstrated that its admission preference is regularly reviewed and currently required to combat those deficits, I respectfully dissent from the majority's contrary conclusion.